UNITED STATES of America,
Plaintiff-Appellant,

v.

Oscar SQUELLA–AVENDANO et al.,
Defendants-Appellees.

No. 71–1143.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1971.

**576**

Neal R. Sonnett, Asst. U. S. Atty., Robert W. Rust, U. S. Atty., J. V. Eskenazi, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellant.

Donald I. Bierman, Miami, Fla., for Oscar Squella-Avendano.

Michael A. Masin, Harry Prebish, Prebish & Masin, P.A., Miami, Fla., for Andres Rodriguez.

Alfred Duran, Angelo Ali, Miami, Fla., for Carlos Rojas.

Donald Frost, Miami, Fla., for Raul DeMaria.

Frank Ragano, Ragano & LaPorte, Miami, Fla., for Marco Osorio.

Theodore Klein (Court-appointed), Fine, Jacobson & Block, Miami, Fla., for Rudolfo Quintanilla.

Albert Carricarte, Miami, Fla., for Jorge Vasquez.

Before JOHN R. BROWN, Chief Judge, and GEWIN and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

The United States appeals from an order granting a motion to suppress the use of about 200 pounds of cocaine as evidence.[1] We perceive no constitutionally unlawful search and reverse.

Acting on a confidential informant's report that certain individuals intended to smuggle a large shipment of Chilean cocaine into Miami, Florida, federal narcotics agents conducted extensive investigation and surveillance. Their efforts culminated in the arrest of appellees and the seizure of about 200 pounds of illegal cocaine. The government's brief provides an accurate description of certain pertinent events preceding the arrest. We quote from it those facts which the defendants have chosen not to dispute:

> Other than that the cocaine was from a Chilean source, it was not known when or how it would arrive in Miami. On July 24, 1970, the informant advised that the cocaine would arrive at anytime. On July 26, 1970, the informant advised that the cocaine had arrived, and the defendants were attempting to rent a certain type of automobile which would be used to pick up and deliver the cocaine. Later, the informant supplied information concerning the make of car that had been rented and gave the agents the last three digits of the license plate, which were 906.

The car was located and placed under surveillance. On the morning of July 27, 1970, it was followed to a parking place in Miami Springs, where the defendants Osorio and Quintanilla left it. It was next seen at about 12:30 p.m. that day, parked beside a C-46 aircraft, where cartons were unloaded from the airplane and into the car. Then, the defendant Squella drove the car back to the parking lot where he parked it in the same parking space that it had been parked in by Quintanilla.

The car remained there until 2:30 that afternoon, when Quintanilla returned, received the car keys from the defendant DeMaria, and drove off.

Quintanilla, in the rented automobile, was followed by Rojas, driving a green Dodge. Driving in tandem, they began circling blocks * * * They stopped the cars, and Quintanilla ran back to Rojas, conferred with him for fifteen seconds, ran back to the rented car, and both cars left in opposite directions at a high rate of speed.

---

1. The right to appeal is granted to the United States by 18 U.S.C. § 1404.

The rented car, containing the boxes, was lost by the surveillance agents. It was later located at the apartment at 44 Santillane Avenue, occupied by Quintanilla. The apartment had not been under surveillance, but agents had driven by to see if the car might have returned there. Quintanilla was observed unloading the cartons from the car and taking them into the apartment. Other agents were notified by radio, and joined the first agent at the apartment. They checked with their headquarters and were told that there was not time to get a warrant.

The circumstances immediately surrounding the arrest are somewhat more in dispute. Accordingly, factual disputes will be resolved in favor of the appellees, but evidence that is uncontradicted will be accepted at its face value unless voided by a district court finding of poor credibility.

About ten minutes after the boxes were unloaded into Quintanilla's apartment, six or eight agents had converged on the scene. Radio instructions from headquarters directed them to effect an immediate arrest, regardless of whether cocaine was found on the premises. No arrest warrant was obtained because, the agents felt, a delay might permit the destruction of evidence and allow the defendants to escape.

The testimony is unclear regarding the exact sequence and time intervals of events immediately preceding the arrest. It is clear, however, that these events occurred in rapid succession, many of them simultaneously. It appears that immediately after the decision to arrest was made, Agent Hudson of the Bureau of Narcotics and Dangerous Drugs went to the door of the apartment, knocked on it, and announced "Police. Open the door." [2] After a pause, during which he heard hurried moving around in the apartment, he repeated the announcement in Spanish, "Policia. Abra la puerta." Meanwhile, Bureau of Narcotics Agent Robinson was stationed at the right front corner window of the house; looking into it, he observed the cocaine strewn on the kitchen floor and pointed it out to Bureau of Narcotics Agent Zell, who accompanied him.[3] Hearing the hurried movements inside, he announced into the window, "Open the door. You're under arrest." [4] At this point, Agent Hudson opened the unlocked front door and immediately saw the cocaine strewn in plain view on the living room floor in boxes and suitcases. Simultaneously with the opening of the door both agents heard the sound of breaking glass at the rear of the apartment. Agent Robinson remained in front to watch the front door, while Agent Hudson ran around to the rear to find the defendant Vasquez climbing out of a window. He was arrested. The defendant Osorio was found hiding in a bedroom closet and was arrested. Quintanilla, who apparently escaped through the back window, was arrested later, as were Squella-Avendano, Rodriquez, Rojas and DeMaria.

2. Agent Robinson, another narcotics agent, testified that Agent Hudson said "federal police." This testimony was rejected by the district court as not credible.

3. It is not clear from the record whether Agent Hudson heard this remark before opening the door. Even if he did, its effect is of no import since the record clearly shows that the decision to enter the apartment and arrest its occupants had already been made.

4. It is not clear from the record whether the remark was "yelled" or merely spoken in a normal tone of voice. It was directed at an object which agent Robinson mistakenly thought to be a man crouched and hiding in a corner of the kitchen.

Defendants attempt to discredit this testimony by including it within the ambit of the district court's disbelief of Agent Robinson's testimony that Agent Hudson identified himself as "federal police." See note 2, supra. To the contrary, the court later implicitly acknowledged its acceptance of this testimony as true.

The trial judge was apparently of the opinion that the agents did in fact have probable cause to effect an arrest, but he nevertheless found the arrest fatally defective because, under the circumstances, he believed the agents fell short of their constitutional duty in failing to procure warrants for the search of the apartment and arrest of the defendants.[5] He expressed, in dictim, an alternative opinion[6] that the arrest could not stand because the agents did not announce their purpose before entering, as required by 18 U.S.C. § 3109[7] and Miller v. United States.[8] The defendants seek to uphold the ruling of the district court upon the grounds given in the opinion below, and assert, in addition, that there was not probable cause for the arrest, and that Agent Robinson's peering through the window of the apartment was an unconstitutional search.

5. In its ruling, the court stated from the bench:
I believe that the facts and circumstances of this case not only indicate, but conclusively demonstrate that a search warrant could have been and should have been obtained in this instance.

6. The court said:
So I am not going to attempt to make any definitive ruling upon the sufficiency, the legal sufficiency of the announcement that was made with respect to the authority and purpose of those officers present at that time and at that location, but if I had to rule on it, under the Miller case, I would hold that the statements that were then and there made in that respect were insufficient in law.

7. The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance * * *.
18 U.S.C. § 3109.

8. 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Under *Miller*, the propriety of an entrance to arrest is to be measured by a standard identical with that set out in § 3109 to test the propriety of an entrance to search.

9. 70 Stat. 570 (1956). The statute has since been changed by amendment which is prospective only in application. 84 Stat. 1293 (1970).

I

At the outset we consider and reject the district court's ruling that warrants should have been obtained prior to the arrest. At the time of arrest 26 U.S.C. § 7607(2)[9] plainly authorized these agents to arrest without a warrant "for violations of any law of the United States relating to narcotic drugs * * * [upon] reasonable grounds to believe that the person to be arrested has committed or is committing such violation."[10] This statute has been directly held constitutional[11] and has repeatedly passed unchallenged before the Supreme Court.[12] Congress apparently chose to enact this measure in order to give narcotics agents broad discretion in performing their duties. On the one hand they are entitled to act quickly, to prevent suspects from escaping or evidence from being destroyed:[13]

10. The "reasonable grounds" standard is equivalent to the constitutional test of probable cause. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958).

11. Spurlock v. United States, 295 F.2d 387 (9th Cir. 1961), cert. denied, 369 U.S. 877, 82 S.Ct. 1149, 8 L.Ed.2d 280; cf. United States v. Monroe, 205 F.Supp. 175 (E.D.La.1962) aff'd 320 F.2d 277, 5 Cir., cert. denied 375 U.S. 991, 84 S.Ct. 630, 11 L.Ed.2d 478; United States v. Vasquez, 183 F.Supp. 190 (D.C.N.Y. 1960); State of La. v. Walker, 206 F. Supp. 544 (E.D.La.1962).

12. See, e. g., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958); Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). In Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) the Court found that 18 U.S.C. § 3052 which allowed warrantless arrests by FBI agents in similar circumstances, "states the constitutional standard." 361 U.S. at 100, 80 S.Ct. 168.

13. See, e. g., United States v. Soyka, 394 F.2d 443 (2d Cir. 1968); United States v. Santiago, 327 F.2d 573 (2 Cir. 1964); Williams v. United States, 260 F.2d 125 (8th Cir. 1958), cert. denied 359 U.S. 918, 79 S.Ct. 596, 3 L.Ed.2d 579.

on the other hand, they are permitted to proceed deliberately in order to strengthen their case or to apprehend additional suspects.[14]

Of course, a warrantless arrest requires closer scrutiny by the courts in determining whether probable cause exists than would an arrest based on the sound judgment of an impartial magistrate.[15] Mindful of this standard, we proceed to a consideration of the defendants' assertion that probable cause for the arrest did not exist.

## II

It is too obvious to require discussion that if the informant's report that the defendants had imported 200 pounds of cocaine is worthy of belief, there was probable cause for arrest. Defendants therefore attack the reliability of the informant, pointing out that he had not previously provided any information to officers by which his reliability could be measured. The consequence is, they say, that the weight of the circumstances offered by the government to show probable cause is critically lightened and falls below the minimum necessary to support a finding of proba-

ble cause. The two-pronged test by which we measure the effect of an informant's reliability on an officer's determination of probable cause was set out in Aguilar v. Texas.[16] To rely on an informant's report to establish probable cause, it must affirmatively appear that the agents were informed of:

[first] some of the underlying circumstances from which the informant concluded that his information was accurate, and [second] some of the underlying circumstances from which the officer concluded that the informant * * * was "credible" or his information "reliable." Otherwise, "the inferences from the facts which lead to the complaint" will be drawn * * * by a police officer "engaged in the often competitive enterprise of ferreting out crime," Giordenello v. United States, supra, 357 U.S. at [480] 486, 78 S.Ct. [1245 at 1250], [2 L.Ed.2d 1503 at 1509]; Johnson v. United States, supra, 333 U.S. [10] at 14, 68 S.Ct. [367] at 369 [92 L.Ed. 436, at 440], or, as in this case, by an unidentified informant.[17]

In Spinelli v. United States[18] the court stated that an informant's tip that

---

14. See, *e. g.*, Carlo v. United States, 286 F.2d 841 (2d Cir. 1961), cert. denied 366 U.S. 944, 81 S.Ct. 1672, 6 L.Ed.2d 855; Dailey v. United States, 261 F.2d 870 (5th Cir. 1958) cert. denied 359 U.S. 969, 79 S.Ct. 881, 3 L.Ed.2d 836.

The value of this rationale is well illustrated by the facts of this case. Had the agents been required to apply for and receive a warrant before effectuating an arrest, they would have been required either to act prematurely on incomplete evidence, thereby risking the consequences of a vague and imprecise supporting affidavit, or to delay action until the fruits of a lengthy investigation could be distilled into a single comprehensive document, with the resulting risk that the suspects would escape or dispose of important evidence.

15. See, *e. g.*, United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

16. 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 2d 723 (1964).

17. 378 U.S. at 114–115, 84 S.Ct. at 1514.

18. 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The defendants' contentions are undercut by the recent Supreme Court decision of United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). That decision indicates the showing which is constitutionally required in order to credit information of a police informer's personal knowledge of criminal activity. In our view *Harris* does not alter the force of our discussion of *Spinelli* as applied to the defendants. Indeed, our application of the teachings of *Spinelli* may be more beneficial to defendants than the *Harris* opinion would justify. It is obvious to us that *Harris* gives new life and meaning to Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1962), and to other pre-*Spinelli* decisions as well. To some extent it erodes the teachings of *Spinelli*. In *Harris* the court declined to apply

did not meet *Aguilar's* requirements literally could nevertheless be used to justify a search or arrest if "it [can] fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration." [19] After noting insufficient support in a search warrant affidavit for the affiant's assertion that the information was reliable (*Aguilar's* second test), the court went on to conclude, after detailed analysis, that there were not sufficient indications in the record that the information had been gained in a reliable way (*Aguilar's* first test). In so doing, there was developed a three-tiered method of analysis for testing whether *Aguilar's* requirements had been met. First, if the information provided is in such "detail" and "minute particularity" that "a magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way," [20] then the report, if sufficiently incriminating, may, without more, be grounds for finding probable cause. [21] Secondly, less detailed information from a reliable source may be used as grounds for a finding of probable cause if independent investigation by law enforcement agencies yields sufficient verification or corroboration of the informant's report to make it "apparent that the informant had not been fabricating his report out of whole cloth." [22] Corroboration must render the report "of the sort which in common experience may be recognized as having been obtained in a reliable way." [23] Thirdly, even a report that is not under the above two standards sufficient of itself to establish probable cause may count in the magistrate's determination of probable cause, but only as one of a number of other factors of "further support" tending to show probable cause. Examples of satisfactory "further support" given in *Spinelli* involved law enforcement agencies' knowledge of independent facts which suggest criminal conduct or of facts which take on an aura of suspicion in light of the informant's tip. [24]

In a third Supreme Court decision on the subject, Whiteley v. Warden, Wyoming Penitentiary, [25] Justice Harlan augmented his writings in *Spinelli* to emphasize that the belief of the arresting officer, or the informant, or both, that the suspects are involved in activity that is *criminal* in nature must be directly supported by information that is reliable

---

*Spinelli* to the extent that it prohibits a magistrate from relying on a law enforcement officer's knowledge of a suspect's reputation.

19. 393 U.S. at 415, 89 S.Ct. at 588. The Second Circuit has accurately restated the *Aguilar* standard, as explained by *Spinelli*, as follows:

Under the principles there formulated, an informer's report alone does not establish probable cause unless the informer conveys enough of the basis of his information to permit an assessment of its validity and unless there are circumstances which manifest the general credibility or reliability of the informant. United States v. Acarino, 408 F.2d 512, 514 (2d Cir. 1969).

20. 393 U.S. at 417, 89 S.Ct. at 589.

21. See, *e. g.*, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958); United States v. Acarino, 408 F.2d 512 (2d Cir. 1969).

22. 393 U.S. at 417, 89 S.Ct. at 590.

23. 393 U.S. at 417, 89 S.Ct. at 590. See, *e. g.*, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Rodgers v. United States, 442 F.2d 902 (5th Cir. 1971); Thompson v. White, 406 F.2d 1176 (5th Cir. 1969); Bailey v. United States, 386 F.2d 1 (5th Cir. 1967).

24. 393 U.S. at 418, 89 S.Ct. 584. See, *e. g.*, McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); United States v. Newsome, 434 F.2d 1024 (5th Cir. 1970); United States ex rel. Cunningham v. Follette, 397 F.2d 143 (2d Cir. 1968).

25. 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

within the meaning of *Aguilar* and *Spinelli*.[26] In *Whiteley* an arrest warrant was issued solely upon the oath of a local sheriff that the defendants "did unlawfully break and enter" a building. The arrest was made by officers who relied exclusively on a police broadcast which stated that a warrant had issued and described the defendants and their car. In holding that the arresting officer's observation that the defendants matched the description in the broadcast would not validate the otherwise inadequate arrest warrant, the court said:

> This Court has held that where the initial impetus for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not adequately be supported by the tip alone. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). But the additional information acquired by the arresting officers must in some sense be corroborative of the informer's tip that the arrestees committed the felony or, as in Draper itself, were in the process of committing the felony. See the opinions of the Court and that of Mr. Justice White concurring in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[27]

Mindful of the purpose of these rules —to guard against police action based upon a " 'suspicion,' 'belief' or mere 'conclusion' ",[28] or upon "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation"[29]—we proceed to analyze the instant facts and conclude that the arrest is justifiable on any of Spinelli's three levels.

On the first level, the meticulous and precise detail of the information supplied is ample indication that the informer's reports were made from direct observation and personal knowledge. He was in frequent contact with the authorities from July 10 until the time of arrest. During this time he provided detailed information of the defendants' evolving plans. According to his information, the defendant Rodriguez was to arrive in Miami from New York to receive a shipment of 30 kilos of Chilean cocaine from a Chilean contact. A detailed physical description of the contact was provided. Rodriguez and two other "couriers" would then transport the drug to New York where they would deliver it to an Italian named "Blackie". While in Miami, Rodriguez could be reached at either of two phone numbers; one was his sister's and the other belonged to someone named "Rudy." On July 14 the informer reported the arrival of Rodriguez. He predicted that meetings between various defendants, including Osorio, Quintanilla, Rodriguez, Vasquez, and Rojas would occur on July 17, 24, and 26. On July 24 he called to report that arrival of the cocaine was imminent. On July 26 he informed agents that it had arrived; that the amount had been increased to 90 kilos, of which Rodriguez would take at least 72; and that it would be transported in a rented white 1970 2-door Ford Galaxy bearing license plates the last three digits of which were 906.

The volume and quality of this information clearly described the accused's

---

26. In other words there is no probable cause if "the existence of the tenth and critical fact is made sufficiently provable to justify the issuance of a warrant by verifying nine other facts coming from the same source." Spinelli v. United States, 393 U.S. 410, 426–427, 89 S.Ct. 584, 594 (White, J. concurring).

27. 401 U.S. at 567, 91 S.Ct. at 1036, 28 L.Ed.2d at 312–313.

28. Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964) ; United States v. Acarino, 408 F.2d 512, 514 (2d Cir. 1969).

29. Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969) ; United States v. Acarino, 408 F.2d 512, 515 (2d Cir.1969).

criminal activity in sufficient detail that "a magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way."[30] Secondly, much of the information was verified or corroborated by the agents' actual observations. Perhaps the most significant of the corroborating circumstances is the fact that the informant arranged a meeting between undercover narcotics agents and the defendant Rodriguez. The record reveals that this meeting resulted in "successful discussions concerning the purchase of cocaine." Additionally, the phone numbers supplied by the informant were traced and were indeed found to be registered to Rodriguez' sister and Rudolph Quintanilla. Rodriguez was first observed at Quintanilla's apartment on July 14. The described Chilean contact proved to meet the description of Osorio. The meetings occurred at the times and places specified. On July 27, the day after the reported arrival date of the Cocaine, the described car was observed parked at the Miami airport beside a C–46 aircraft from which cartons were being loaded into the car.

Finally, there is ample "further support" in the record that would justify a finding of probable cause even if the informer's tips were not independently reliable. We speak here of the purchase negotiations; Quintanilla's evasive driving techniques,[31] clearly intended to avoid observation; the attempt to flee from surveillance; the frequency and variety of meetings between the defendants; and the suspicious activity connected with loading and picking up the car at the airport on the date of arrest. Colored by the informant's information, even if it were not technically reliable, the agents had ample basis upon which to conclude that an offense had been committed.

Appellants also contend that the second of *Aguilar's* tests has not been met because the officers had not used the informant in connection with other investigations and that accordingly his reliability has not been sufficiently shown. We find no merit in this contention. Proof of past reliability is but one way of buttressing an informant's credibility. Indeed, if it were the only way, so called "reliable" informants would be scarce, if not non-existent. By its own terms, *Aguilar's* second requirement was erected to insure that the informant was a "credible" person who would likely provide "reliable" information.[32] Its obvious purpose is to discourage police officers from acting to search or to arrest on information that is carelessly, maliciously, or otherwise unreliably disclosed —i. e. "a reckless or prevaricating tale." [33] It is an assurance that officers will act with reasonable confidence in the truth of those portions of the report, often of critical importance, which are not practically susceptible to verification by investigation or observation. If sufficient corroborative evidence can be collected to support a clear inference that the informer was generally trustworthy, then *Aguilar's* second requirement is met.[34]

30. Spinelli v. United States, 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969).

31. In addition to his attempt to escape surveillance while transporting the smuggled cocaine to the apartment, agents frequently observed him circle the block in which his apartment was located presumably to check for a "tail" before proceeding on his way.

32. 378 U.S. at 114–115, 84 S.Ct. 1509.

33. Jones v. United States, 362 U.S. 257, 708, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

34. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Accord: United States v. Gonzalez-Perez, 426 F.2d 1283 (5th Cir. 1970); United States v. Coronado, 426 F.2d 927 (5th Cir. 1970); United States v. Cabrera, 417 F.2d 211 (5th Cir. 1969); Thompson v. White, 406 F.2d 1176 (5th Cir. 1969); Bailey v. United States, 386 F.2d 1 (5th Cir. 1967); Cali v. United States, 338 F.2d 974 (1st Cir. 1964); United States v. Sharpe, 322 F.2d 117 (6th Cir. 1963). *Spinelli* fully supports this analysis. In discussing the effects of the FBI's independent investigative efforts, the Court

There is ample corroboration of that type in this case. The fact that the informant arranged illicit purchase negotiations is itself a potent indication to the agents that the informant's accusations and knowledge of criminal activities was firmly credible. Additionally, the previously enumerated wealth of verified details supplied by the informant may properly be considered in assessing his veracity and credibility.[35] These details, coupled with the fact that he arranged illicit purchase negotiations, provide conclusive corroboration of his reliability. In sum, we conclude that the requirements of *Aguilar, Spinelli* and *Whiteley* have been met. There was ample probable cause to arrest.

## III

■ Defendants next assert that the evidence must be suppressed because, even though the warrantless arrest was not unlawful, the searches which resulted in the seizure of 200 pounds of cocaine were. We cannot agree. When agent Hudson opened the door to enter, the drug was in plain view on the living room floor. Without question, it was subject to seizure at that time.[36]

Defendants nevertheless assert that the evidence must be suppressed because Agent Robinson's view through the window, which apparently took place just seconds prior to their arrest, was an unjustified warrantless search. We agree that Agent Robinson's conduct must be

regarded as a search,[37] but are nevertheless of the opinion that it suffers no constitutional infirmity because it was necessarily executed pursuant to a valid arrest that was in no way dependent upon Agent Robinson's observations to bootstrap its validity. In this case the events leading up to the arrest occurred in such close sequence that it is immaterial that the arrest occurred later in time than Agent Robinson's view into the house.[38] Under *Chimel v. California*,[39] an arresting officer may constitutionally search a suspect and the area "within his immediate control"[40] in order to avoid danger to himself and to prevent the destruction of evidence. In this case, the agents had been cautioned that defendants might be armed and dangerous. Moreover, the agents knew that their surveillance had been detected. In these circumstances it is certainly reasonable for the agents to survey the apartment in an attempt to learn in advance whether the arrest would be dangerously and forcefully resisted. It would have been imprudent indeed for them to enter the apartment without exercising at least this degree of care for their own safety. We will not, nor does *Chimel*, require them to do so since the search was incident to a lawful arrest.

## IV

■ Finally, defendants attempt to establish that the cocaine was unlawfully seized, since its seizure was preceded by a technical "breaking" of the door by

concluded that under the facts there presented, that the inference to be drawn therefrom "cannot by itself be said to support both the inference *that the informer was generally trustworthy* and that he had made his charge against Spinelli on the basis of information obtained in a reliable way." 393 U.S. at 417, 89 S.Ct. at 589 (emphasis added).

35. Id.

36. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); United States v. Williams, 446 F.2d 486 (5th Cir. 1971).

37. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); State of Texas v. Gonzales, 388 F.2d 145 (5th Cir. 1968); Brock v. United States, 223 F.2d 681 (5th Cir. 1955). It is beyond dispute that Agent Robinson violated the curtilage of the apartment.

38. United States v. Brookins, 434 F.2d 41 (5th Cir. 1970), cert. denied 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (and cases there cited); Kinser v. Cooper, 413 F.2d 730 (6th Cir. 1969); Holt v. Simpson, 340 F.2d 853 (7th Cir. 1965).

39. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969).

40. Id. at 763, 89 S.Ct. 2034.

agents who had not properly announced their purpose in demanding admission. According to Miller v. United States,[41] to justify the breaking it must appear either that the agents did in fact announce their purpose or that facts known to them before the breaking would "justify them in being virtually certain that [the occupants] already [knew] their purpose so that an announcement would [have been] a useless gesture."[42]

In the circumstances of this case, we do not hesitate to hold that *Miller's* requirements have been met; the officers were fully justified in being "virtually certain" that the occupants of the apartment were aware of an impending arrest. The officers knew that the suspects had detected their surveillance only a short time beforehand, and they knew that a violation of the narcotics laws was being perpetrated inside. Agent Hudson knocked on the door, announced "Police" in English and Spanish and directed the occupants to "open the door." Agent Robinson announced through the window "you are under arrest."[43] Although no attempt was made to open the door, both agents heard hurried movement inside. The sound of breaking glass was heard just as Agent Hudson opened the door. We conclude that it would be grossly unrealistic to say that, at this point, the occupants of the apartment did not suspect discovery and fear arrest when "police" came to their door.[44] A more elaborate announcement of purpose by the agents in this case would indeed have been a "useless gesture"; and the agents were

justified in being "virtually certain" of this fact.[45]

In conclusion, we hold that the defendants' motion to suppress should have been denied. The judgment of the district court is reversed and the case is remanded to the district court for proceedings not inconsistent with this opinion.[46]

Reversed and remanded.

---

41. 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

42. Id. at 310, 78 S.Ct. at 1196.

43. Although we doubt that his statement is itself determinative of whether § 3109 was complied with, see notes 2 and 3 supra, it is an important consideration in determining whether *Miller's* standard of "virtual certainty" has been complied with.

44. Additional evidence plainly shows that the occupants of the apartment were in

fact aware of the officers' purpose. The record clearly shows that all three of them attempted to avoid arrest by hiding or escaping.

45. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

46. Because of our conclusion that no unreasonable search occurred we need not consider whether all defendants had standing to raise the 4th amendment issue.