**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Chester WYSOCKI, Defendant-Appellant.**

**No. 71-1663.**

United States Court of Appeals,
Fifth Circuit.

April 10, 1972.

Harvey Swickle, Miami Beach, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Richard A. Hauser, George A. Kokus, Asst. U. S. Attys., Miami, Fla., by Charles O. Farrar, Jr., Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before TUTTLE, GEWIN and DYER, Circuit Judges.

GEWIN, Circuit Judge:

This is an appeal from an adjudication of guilt in a non-jury trial. The appellant was indicted under two counts. Count one of the indictment charged the appellant with passing stolen money orders knowing the same to have been taken from a bank in violation of 18 U.S.C. § 2113(c). Count two charged him with transportation of stolen securities in interstate commerce in violation of 18 U.S.C. § 2314. He contends that the evidence used against him should have been suppressed. We find his claims to be without merit and affirm.

## FACTS

In April, 1970 a bank in Detroit was robbed of $70,000 in American Express money orders. Shortly thereafter agent McNamara of the FBI received information that certain of these money orders had been cashed at a bank in Hollywood, Florida. McNamara interviewed the bank teller who had cashed the money orders and learned that the man who had presented them identified himself as Lou Allen and that he was probably staying at the Castaways Motel. Agent McNamara, accompanied by Agent Flynn, proceeded to the Castaways Motel and were informed by the credit manager that Lou Allen and an unidentified man were registered there and would be checking out the following day. McNamara then placed a telephone call to the Detroit FBI office for further information. He was given a description of Chester Wysocki, appellant herein, and was advised that appellant had previously been convicted of armed bank robbery and that he was made out (by the FBI) as a "principal" in the Detroit robbery which was the subject of agent McNamara's investigation. Moreover, McNamara was informed that Barney Wysocki, appellant's brother, had been arrested in Las Vegas in possession of nearly half the stolen money orders.

Agents Flynn and McNamara then proceeded to Lou Allen's motel room where through the open door they recognized appellant from the description supplied by the Detroit office.[1] After knocking on the door the agents identified themselves and asked appellant his name. Appellant told them, and the agents immediately placed him under arrest, although they did not have a warrant.

Appellant was ordered to sit in a chair placed in the middle of the room. The motel room was estimated by the officers to be 10 to 12 feet wide and possibly 14 to 16 feet in depth. Wysocki was sitting in the middle of the room within approximately six feet of the closet. The officers did not conduct a search of the room, they only searched the immediate area where they found Wysocki. The closet door was open. The agent was asked by Wysocki to go to the closet to get some clothes. When he did so, the agent saw a maroon colored box half covered with a Sears, Roebuck paper bag. He picked up the box and stated to Wysocki "Here's your gun." The agent testified that he knew Wysocki's record, knew he had been convicted of armed robbery and had been cautioned about possible danger when and if Wysocki was apprehended. He testified that he was looking for a gun at the time of the arrest in the room, and upon seeing the box concluded that "it was a gun box."[2] Believing that

---

1. Appellant did not fit the description of Lou Allen which had been provided by the bank teller.

2. The agent testified that his conclusion that the seized box was a "gun box" was based on 30 years experience. The following is from his testimony:

Q. Agent McNamara, I believe you testified that you went with the F.B.I. in 1940; is that correct?

the box contained a gun, McNamara opened it and discovered therein a batch of the stolen money orders, some bearing the name "Lou Allen." Appellant was taken downtown and booked; some eight thousand dollars in cash, which appellant had with him at the time of his arrest, was impounded.

The following day agent McNamara procured a warrant to search Lou Allen's motel room. This search turned up more of the stolen money orders.

On these facts appellant was indicted and charged with violations of 18 U.S.C. § 2113(c) and 18 U.S.C. § 2314. Thereafter he filed a Motion to Suppress and a Motion for the return of Seized Property, which motions were denied by the trial court. Appellant then stated that he wished to preserve his right to appeal from the court's ruling on the motions, but offered to stipulate to the truth of the allegations contained in count one of the indictment which charged him with passing money orders knowing they had been stolen from a bank. In exchange the government agreed if the court found appellant guilty on count one to dismiss count two which charged him with transportation of stolen securities in interstate commerce. One of the arresting FBI agents testified as to Wysocki's involvement with the stolen money orders. Wysocki renewed his motion to suppress. The court denied his motion, adjudged him guilty on count one and sentenced him to nine years imprisonment to run concurrently with a Michigan state sentence, from which judgment he now appeals. Count II of the indictment charging transportation of stolen securities in interstate commerce in violation of 18 U.S.C. § 2314 was dismissed on motion of the government.

## ISSUES

Appellant here alleges three basic constitutional infirmities in the procedures which led to his conviction:

(1) That his warrantless arrest was not based upon probable cause;

(2) That even if the arrest were valid, the search and seizure of the box in the closet was unreasonable; and

(3) That the search warrant procured on the day following appellant's arrest was not supported by probable cause and further that it was procured on the basis of evidence illegally seized at the time of appellant's arrest.

Thus, it is argued, all of the stolen money orders introduced as evidence against appellant should have been suppressed.

We consider each of these contentions separately hereafter in the same order as specified by the appellant.

## PROBABLE CAUSE FOR ARREST

In deciding whether vel non there was probable cause for arrest we first consider Brinegar v. United States, 338 U.S. 160 at 175, 69 S.Ct. 1302, 93 L.Ed. 1870, wherein the court carefully delineated the standard to be applied. As in *Brinegar*, we deal in this case with probabilities not technicalities; the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. As repeatedly stated in *Brinegar* and other cases, " 'the substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' " In Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), the

---

A. That's correct.
Q. And during your approximately thirty years with the bureau have you had occasion to see gun boxes before?
A. Many times.
Q. When you first saw this box on the shelf above Chester Wysocki's clothes, what did you think that box contained?

A. I thought it was going to be a Sears and Roebuck gun. I have had many cases with Sears and Roebuck guns in them.
There was no objection to any of the agent's testimony about the so-called "gun box."

principles of *Brinegar* were reaffirmed. There the Court succinctly stated that the question to be decided is "[W]hether prudent men in the shoes of these officers would have seen enough to permit them to believe that petitioner was violating or had violated the law." 361 U.S. at 102, 80 S.Ct. at 171. These fundamental concepts have been affirmed time and time again. *See* United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); United States v. Squella-Avendano, 447 F.2d 575 (5th Cir. 1971) cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); United States v. Brookins, 434 F.2d 41 (5th Cir. 1970) cert. denied, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811; Klingler v. United States, 409 F.2d 299 (8th Cir.) cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969).

We must apply these principles to the record facts and decide whether the officers in the instant case, as prudent men, saw and knew enough reasonably to believe that Wysocki was violating or had violated the law. At the time of arrest, the record discloses that the arresting officers knew the following undisputed facts: (1) a branch bank in or near Detroit, Michigan had been robbed recently of $70,000 in money orders; (2) Lou Allen was implicated in and connected with that robbery; (3) Allen was passing money orders taken from the robbed bank when he was observed in Hollywood, Florida; (4) Allen was registered at the Castaways Motel, and according to the clerk had pre-determined to depart the next day, he gave a Michigan address and he was driving an automobile with a Michigan license plate, the state in which the robbed bank is located; (5) Wysocki's brother, Barney Wysocki, was definitely involved in the robbery of the Michigan Bank; and he was in possession of approximately one-half of the stolen money orders at the time of his arrest in another state; (6) Chester Wysocki had a record as an armed robber; (7) an accurate description of Chester Wysocki which had been furnished by the FBI office in Detroit; (8) another person, though not registered, was occupying the room with Lou Allen; that occupant turned out to be Chester Wysocki, a fact the officers ascertained before arrest; (9) the Detroit FBI office had reason to "believe" that Chester Wysocki was the person occupying the room with Allen; (10) the FBI office in Detroit had advised that Chester Wysocki was "made as the principal" in the Detroit bank robbery.

When the officers approached Lou Allen's room in the motel at 5 o'clock in the afternoon, the door was partially open. Inside the room using the telephone was a person who fit the description of Chester Wysocki. The officers knocked on the door, gained the attention of the occupant, identified themselves, recognized Wysocki by the description furnished and asked him his name. He immediately responded that he was Chester Wysocki. In these circumstances the officers made the arrest.

In our judgment not only did the officers, *as prudent men,* have probable cause to arrest Wysocki, they would have been negligent and derelict in the performance of their duties if they had failed to arrest him. It would be a rather singular circumstance for Wysocki, solely because of friendship, accident, or an unplanned incident to be in the room of Lou Allen as an unregistered, innocent guest many miles away from his home in Michigan at the crucial time when Allen, implicated as he was in the bank robbery, was engaged in the business of disposing of the robber's loot. Persons engaged in such activity are known to be rather agile and stealthy. They are usually not novices, and they change locations swiftly. Wysocki was experienced in the business of armed robbery. The officers knew in the late afternoon on the day of the arrest that Allen had scheduled his departure the very next day. He had already cashed a number of the stolen money orders. To assume that Allen would publicly dis-

close the plans he intended to follow and take his departure as announced, especially after Wysocki had seen two men looking into the motel room would be naive, considering the business in which he was then engaged, and the background experience and record of Wysocki as a convicted armed robber.

■ It is totally unreasonable to conclude, as suggested by appellant, that the officers should have engaged in some kind of delaying tactics near the close of the day and provide these obvious law violators an opportunity to slip away in the darkness of the night. Once the officers went to the motel room, and surely they had a right and duty to go to Allen's room, both Wysocki and Allen would have been alerted to the facts. Knowing these facts, there would have been ample opportunity to plan and execute their departure and escape absent an arrest. The exigent circumstances present at the time of arrest, the danger of the loss, removal or destruction of evidence, the nature of the evidence and the character of the criminal activity involved of which the officers had reliable information, all point clearly and unequivocally, to the necessity of taking action without delay. Not only was there probable cause to arrest, the facts impelled swift action.

## SEARCH AND SEIZURE

We reject the appellant's contention that even if the arrest was valid, the money orders taken from the box ought to have been suppressed as the fruits of an unlawful search.

■ Accepting the agent's testimony at its face value as the trial court was authorized to do, we come next to the question whether it was lawful for him to seize the box and open it in the circumstances disclosed by the record. In reaching our decision we are confronted with the fact that the agent's judgment

that the box contained a gun proved to be erroneous. But we do not deem that to be the controlling question. We do not decide such questions with hindsight; if we did, the box was subject to seizure because it contained stolen money orders. We must consider the case on the basis of what the officers saw and the reliable information they possessed. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). It is not necessary for the officer to know at the time the evidence is seized that it will finally be adjudged to be competent, admissible evidence. All the component parts of an item of evidence cannot be analyzed, classified and its admissibility ascertained on the spur of the moment by an arresting officer. Exigent circumstances do not permit such careful deliberation. The appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers must be considered. For example, what appears to be a dangerous weapon may turn out to be a harmless toy pistol. The hijacker of an airplane may place a stewardess in total fear by pressing the sharp point of a fountain pen in her back to create the illusion that he is using a dangerous weapon.

■ In our opinion the presence of a person with a known record as an armed robber within six feet of what appeared to Agent McNamara to be a gun box in a small motel room, the officers having been cautioned of appellant's dangerous propensities, the agent being where he had a right to be, and believing in accordance with his long experience that the box contained a gun, when considered with all the other facts disclosed by the record would constitute a sufficient basis to conclude that the search was reasonable, and that the seizure of the box was not contrary to Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).[3] *See*

3. We are not unmindful of the numerous cases dealing with plain view. Coolidge

v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ; Harris v.

*also* United States v. Harris, *supra;* United States v. Squella-Avendano, *supra;* United States v. Brookins, *supra;* Klingler v. United States, *supra.*

## SEARCH WARRANT

■ In view of our conclusions that the arrest was valid and the search and seizure incident to it was reasonable, it is not necessary to write at length about the search warrant. The search warrant authorized the search of room 462 of the Castaways Motel which was registered in the name of Lou Allen. When the warrant was issued, Agent Mc-Namara who signed the affidavit was well aware of Lou Allen's unlawful activity and that room 462 formed the base of his unlawful operations. He also knew that Allen was directly implicated in the bank robbery and was disposing of loot gained therefrom. His affidavit was full and complete and recited the factual information which clearly demonstrated the unlawful conduct under consideration. The only possible flaw would be the conclusion that knowledge to support the search warrant was gained by the seizure of the stolen money orders in the motel room if such seizure were held to be unlawful. Since we consider both the arrest and the seizure lawful, it follows that the search warrant is valid. See United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

The disposition of the money taken by the agents at the time of arrest is left open until proceedings are completed in the trial court relating to the status and ownership of the funds after a full development of all pertinent evidence and a consideration of any adverse claims that may be made to the money.

■ One further matter bears brief mention. At the conclusion of the testimony offered by Wysocki in support of his motion to suppress, Wysocki's counsel requested a recess ". . . so we can talk about a possible plea." Subsequently his counsel stated that he wished

United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) ; United States v. Drew, 451 F.2d 230 (5th Cir. 1971) [No. 71–1220, November 29, 1971] ; United States v. Knight and Grubbs, 451 F.2d 275 (5th Cir. 1971) [1971] ; United States v. Davis, 423 F.2d 974 (5th Cir. 1970), cert. denied, 400 U.S. 386, 91 S.Ct. 74, 27 L.Ed.2d 69. We find it unnecessary to deal with the plain view doctrine in the circumstances of this case, although it could conceivably be argued that the plain view doctrine applies in view of the testimony of Agent McNamara based on 30 years experience as a law enforcement officer. Courts exercise a broad sound discretion in passing upon the qualifications of an expert. Wolford v. United States, 401 F.2d 331 (10th Cir. 1968) ; DeFreese v. United States, 270 F.2d 737 (5th Cir. 1959) cert. denied 362 U.S. 944, 80 S.Ct. 810, 4 L.Ed.2d 772 (1960). Witnesses of proved experience in a trade or business with respect to which opinion evidence is desired are ordinarily considered qualified to testify as to such opinions. Ignacio v. People of Territory of Guam, 413 F.2d 513 (9th Cir. 1969) cert. denied, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970) ; Holm v. United States, 325 F.2d 44 (9th Cir. 1963) ; United States v. Toner, 173 F.2d 140 (3d Cir. 1949) ; C. Wright, 2 Fed.Prac. & Proced. §§ 454–55 (1969) ; Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (officer who saw brick shaped package containing "green leafy substance" in the kitchen of a residence from a distance of several feet testified that he recognized the substance as marijuana) ; United States v. Chalk, 441 F.2d 1277 (4th Cir. 1971) (officer testified that he saw what appeared to be the butt end of a shotgun partially covered by some papers on the floor behind the front seat of an automobile) ; United States v. Bourassa, 411 F.2d 69 (10th Cir.) cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969) (secret service agent allowed to testify that coins were counterfeit) ; United States v. Longfellow, 406 F.2d 415 (4th Cir. 1969) (testimony received that paint on stolen vehicle was similar to paint seized under search warrant) ; Bryan v. United States, 373 F.2d 403 (5th Cir. 1967) (error to exclude testimony of expert that firearm was a pistol) ; United States v. Clancy, 285 F.Supp. 98 (S.D. Miss. 1968) (officers permitted to testify as to odor of mash).

to preserve for appellate review the denial of the motion to suppress, but then ". . . stipulated that the allegations in count one of the indictment are true as alleged." The stipulation was conditioned upon the government's dismissal of count two of the indictment. The court then heard testimony from Agent McNamara concerning the offense charged in count one and thereafter adjudged Wysocki guilty of that count.

This comes close to plea bargaining. It seems anomalous that the government would agree to dismiss count two for any other reason. The government thus argues that the stipulation has the legal effect of a waiver of all non-jurisdictional defenses or defects, and should therefore preclude Wysocki from now taking an appeal from the trial court's denial of his motion to suppress.

Wysocki explicitly conditioned the stipulation on his right to appeal from the denial of his motion to suppress. Without approving this procedure, we are unwilling, *in this instance,* to foreclose appellate consideration of this matter.

The judgment is affirmed.

TUTTLE, Circuit Judge (dissenting):

It is one of the most uniquely difficult tasks for an appellate court to approach with calm judicial detachment the need to reverse on a "technicality" a conviction, and possibly end the prosecution, of a person now shown, by the record before the court, to be guilty of a serious crime. I use the term "technicality," of course, in its much too simplistic meaning—that is, to comprehend errors of procedure as distinguished from errors of substance. It is no easier for the court, even though the procedural errors complained of relate to rights that are guaranteed by the literal command of the United States Constitution.[1]

It becomes somewhat less difficult for the court as we realize that it is almost always a convicted criminal whose case can present an important constitutional question—a question of the kind which has been one of the very main concerns of the Supreme Court of the United States over the years, for, it is apparent that unless there has been a conviction in a case in which the accused has been unsuccessful in urging the constitutional deprivation of his rights, there could be no vehicle before the Supreme Court which could present the question for decision.

Thus it is that, while frequently not understood by the public generally, the "technicalities" of the Fourth Amendment are for the protection of the guilty as much as for the innocent. I feel it appropriate to make these comments because of the fact, as indicated by the majority opinion, that when the trial court overruled Wysocki's motion to suppress, counsel for Wysocki, although expressly reserving his right to appeal from that ruling, stipulated to the truth of the allegations in one count of the indictment.

Thus, although I am no happier than are my colleagues over the prospect of frustrating the proceedings of the trial court, I must, with all respect and deference to their views, dissent.

There is no disagreement between us as to the issues: (1) Was there probable cause for Wysocki's arrest; and, if so, (2) Was the search that turned up the money orders a legal search. Of course, both the arrest and search were without a warrant.

With respect to the first issue I do not agree that the cumulation of circum-

[1]. The Fourth Amendment to the Constitution says: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

stances here amounts to probable cause. It appears to me that appellant Wysocki's arrest was predicated largely on the fortuitous circumstance that he was lodged with Lou Allen in the same motel room—in other words, guilt by association. The majority rationalizes its result by noting that persons engaged in the business of disposing of robber's loot are "known to be rather agile and stealthy. They are usually not novices, and they change locations quickly," and that the FBI agents were impelled to take swift action in arresting Wysocki lest he flee in the night. Aside from the fact that these are pure speculations by *this* court, not supported by anything in the record, this consideration is relevant only as to the issue whether the FBI agents had sufficient time to procure an arrest warrant and has no bearing whatsoever on the issues before us, i. e., whether there was probable cause to arrest Wysocki in the first place.

Significantly there was no effort to show why at approximately 4:30 o'clock on an April afternoon (there thus being some two to three hours remaining of daylight), the man seen in Allen's room who had readily given his correct name could not have been kept under surveillance long enough to permit one of the agents to seek a warrant for his arrest. It seems clear to me that the reason they did not do so was that they fully realized they did not have sufficient evidence upon which a magistrate could issue such a warrant.

Prior to encountering appellant in Lou Allen's motel room, agent McNamara knew only that appellant had previously been convicted of armed bank robbery, that he was "made out" as "principal" in the Detroit robbery, and that his brother Barney Wysocki had been arrested in Las Vegas in possession of nearly half the stolen money orders. Of these facts the last is plainly irrelevant to the question whether there was probable cause to arrest Chester Wysocki. The maxim "blood is thicker than water" cannot be translated into a constitutional doctrine that the crimes of one man, *in vacuo*, can be imputed to his siblings. Barney Wysocki's involvement in the Detroit robbery would be relevant to the inquiry here only if a connection, other than familial, had been established directly linking appellant to his brother and to the bank robbery in Detroit. Since the government adduced no evidence of such an extra-familial connection, the arrest of Barney Wysocki in Las Vegas has no more significance to the questions presented by this case than if the man arrested in Las Vegas had been named Barney Google.

Further, if agents Flynn and McNamara, armed with the information supplied by the Detroit FBI office, had encountered appellant on the streets rather than in Lou Allen's motel room, they most certainly would have lacked probable cause to arrest him. The circumstance that appellant had previously been convicted of armed bank robbery clearly does not amount to probable cause. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). And, since a warrant for appellant's arrest had not been sworn out in Detroit, the fact that appellant was "made out" as "principal" in the robbery must mean only that he was, in the opinion of the Detroit FBI office, the prime suspect. Mere suspicion, of course, does not measure up to the requirements of probable cause. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). The fact that the agents' superiors in Detroit had "made" Wysocki "out" as "principal" in the robbery was no more significant than for the chief of police of a city to tell his patrolman to pick up a suspect because "I think he is the man we want." This adds not a feather's weight to the sum of circumstances upon which the court bases its finding of probable cause.

There remains to consider, then, the legal significance of appellant's presence in Lou Allen's motel room. Unquestionably there was probable cause to arrest *Allen,* but up until then, insufficient cause to arrest appellant. Thus, the pivotal issue here is whether probable

cause can be "caught" from those with whom one associates. The Supreme Court has held otherwise. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1967); United States v. DiRe, 332 U.S. 581, 68 S.Ct. 222, 92 L. Ed. 210 (1948). Doubtless there was good reason to *suspect* appellant, but that is not enough. Appellant was simply one suspect found in the room of another suspect whom there was probable cause to arrest. On this record there is not one fact which pointed plainly, unequivocally, and directly to appellant, prior to his arrest, as a participant in the bank robbery.

Moving next to the question raised by the search of the Sears-Roebuck "gun box" that was half enclosed in a Sears-Roebuck bag out of reach of Wysocki— an ordinary box that, by the testimony of the agents, could have contained *anything* small enough to fit in it, and which did *not* contain a gun or any special fitting for a gun, I think the decision of the majority cannot conceivably be squared with Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1968). In that case the Supreme Court said:

> "(I)t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area *'within his immediate control'*—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

> "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches . . . may be made only under the authority of a search warrant." (Emphasis supplied) at 763, 89 S.Ct. at 2040.

The facts in the case before us indicate that the box in the closet was *not* within the immediate control of appellant. By holding to the contrary the majority, in my view, erodes the prophylactic purpose of the Chimel rule.

I note that following his arrest appellant was told to sit in a chair placed in the middle of the room. Agents Flynn and McNamara then made a thorough preliminary search of the area immediately surrounding appellant, but not including the closet. Indeed on cross-examination agent Flynn admitted that had appellant been fully dressed when he was arrested there would "probably not" have been any reason for the officers to enter the closet. Moreover, the agents neither drew their guns nor attempted to shackle appellant or render him immobile. Plainly the agents themselves must have believed that appellant was not in a position to grab a weapon or seize destructible evidence. As a precautionary measure one agent positioned himself behind appellant, who was sitting, and the other in front of him. When agent McNamara went to the closet to get appellant's clothes, agent Flynn continued to stand behind appellant in order to restrain him, if necessary. Moreover, at the closet door agent McNamara must have been an effective guard against the possibility that appellant might attempt to leave his chair, jump to the closet, take the box out of the Sears-Roebuck bag, open the box and then seize a weapon from within the box in the closet. It seems to me little short of fantastic to think that if he really were concerned about a gun in the closet, in such a situation the agent would not have taken the simplest step to prevent any such untoward event by merely slamming the door shut. I am unshakably of the opinion that the box was outside that limited

area which *Chimel* permits to be searched pursuant to an arrest.[2]

The majority notes that the search might have been validated under the "plain view" rule. I would point out, however, that whereas the box was in plain view, after the agents went to the closet, its contents were not. A closed and innocuous appearing box is not unlike a closed dresser drawer, the warrantless search of which Chimel plainly forecloses unless it is within the immediate reach of the arrestee. Moreover, it is unavailing to assert that the agent's expert testimony could be used to establish the contents of the box, for since the box was beyond the immediate control of the appellant, the agents were without authority to open it, just as they would be without authority to open closets and drawers which are beyond the immediate control of any arrestee.

For the foregoing reasons I would reverse appellant's conviction.

2. If it were not for the fact that my brethren sincerely believe that somehow the characterization of the box in the Sears paper bag as a "gun box" by the agent made it in effect a gun lying in plain view (laying aside for the moment that it was not within the area to pose a threat as limited by Chimel), I must say that I would think this characterization too flimsy to have our serious attention. The box was not introduced in evidence but it is patently clear from the record that it was an ordinary box, having neither any special shape nor configuration; cf. United States of America v. Drew, 5 Cir., 1971, 451 F.2d 230. Moreover the identification of the box as a gun box was not made by the kind of expert testimony from which a witness is sometimes permitted to use his experience in detecting equipment used for a still or the identity of counterfeit money or the like. He merely stated that he "believed it to be," or that he "thought it to be" a gun box. Strangely enough he arrived at this conclusion only by saying that this ordinary box could be fitted with a liner in which a gun could be set. The quotation in the majority opinion does not include the following:
"Q. You could not see into the box, is that correct?
A. Correct.
Q. And you could not see through that bag?

A. I could see the end of the box.
Q. You could see into the box?
A. The end of the box.
Q. You could see the end of the box, I see, that is e-n-d?
A. Yes, right.
Q. And you went over and took that, is that correct?
A. Yes, I thought it was a gun box.
Q. You thought it was a gun box?
A. Yes.
Q. Does that box have the configuration of a gun?
A. No, but you can put a cardboard inner in it and set a gun in there very easy.
Q. You could put gum bands in there, couldn't you?
A. Yes.
Q. Toothpaste, shaving cream?
A. Yes.
Q. A swimsuit?
A. Right.
Q. Anything at all, right?
A. Correct.
Q. But you thought it was a gun box?
A. Right, I thought it was a gun box.
Q. And you thought it was a gun box because you wanted to justify the search, didn't you?
A. I did not do a search.
Q. Well you did seize, did you not?
A. I seized that because I saw it."