UNITED STATES of America, Plaintiff-Appellee,

v.

James Lee WORTHINGTON, Defendant-Appellant.

No. 76–1586.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1977.

Rehearing and Rehearing En Banc Denied Feb. 16, 1977.

C. Anthony Friloux, Jr., Gerald A. Woolf, Houston, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr.,

James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

SIMPSON, Circuit Judge:

James Lee Worthington was charged in a one count indictment with possessing approximately 843 pounds of marijuana with intent to distribute, in violation of Title 21, U.S.C., Section 841(a)(1). He pled not guilty, and was found guilty as charged by the district court in a bench trial, after waiving a jury. The hearing on Worthington's motion to suppress the evidence as to his warrantless arrest and the search of his aircraft was conducted simultaneously with the trial on the merits. The basis for appellant's conviction was the court's finding that probable cause existed for the arrest and search. This appeal is from the judgment of conviction and Worthington's sentence to 3 years confinement to be followed by a special parole term of 3 years.

The appellant's primary contention is that the district court erroneously denied his motion to suppress the seized marijuana as the fruit of an illegal arrest and search. He asserts further that the court should have conducted an *in camera* interview with the confidential informer so as to determine whether to permit disclosure of the informer's identity and access to him as a witness. We find these contentions to be lacking in merit and affirm the conviction.

The following recitation of uncontested facts is distilled from the transcript of the hearing, in combination with the fact findings of the trial judge. The two versions differ slightly in immaterial particulars. On April 27, 1974, federal Drug Enforcement Administration (DEA) Agent Gary Morrison, received a telephone call from a Mr. Anderwald, the owner of Air Central[1] at the Harlingen Airport located near Harlingen, Texas in the lower Rio Grande Valley.[2] Mr. Anderwald told Agent Morrison

---

1. Not further identified in the record.

2. Harlingen is approximately ten miles from the Mexican border.

that a Cessna aircraft with its rear seats removed had just arrived, piloted by a bearded young man. Agent Morrison testified at trial that the aircraft described by Anderwald is the type commonly used to transport contraband. Shortly thereafter, Agent Morrison received a call from a person who had previously furnished him with reliable information. This informer told Agent Morrison that a bearded young man had just arrived in Harlingen and would leave in a small aircraft with a large amount of marijuana. He also reported that this young man was meeting with other persons at a green mobile home behind the Casa Blanca Motel in Harlingen. No further information was obtained from the informer. Agent Morrison verified the location of the green trailer. He also learned that the Cessna aircraft had been recently leased to a James Worthington.

A Customs officer, who had observed the aircraft land, noted that it contained boxes marked "Cessna Aircraft Parts" in place of the rear seats. He and Agent Morrison kept the airplane under surveillance and were soon joined by two Customs agents. In the early morning hours of April 28, 1974, an electronic tracking device ("beeper") was placed on Worthington's aircraft by the Customs agents to assist in the surveillance. Later that morning the agents saw appellant Worthington arrive at the airport in a Mercury Capri with another man. The Customs agents then took off in their aircraft. From the air, they observed appellant take off. Visual contact with his plane was soon lost. A few minutes later the "beeper" stopped transmitting information and did not function thereafter. But by monitoring radio communications, the Customs agents were able to determine that appellant's aircraft was headed for Hooks Airport in Houston. When they arrived there, they saw appellant unload the boxes and replace the rear seats. The agents later examined the boxes and found them empty. A DEA agent based in Houston told one of the Customs agents at Hooks Airport that appellant was suspected of drug dealing in the Houston area.

Later that same day, Worthington returned to the airport, again removed the rear seats, and took off in the aircraft. The Customs agents, maintaining visual contact, followed appellant to Harlingen Municipal Airport; from there he went to the green trailer behind the Casa Blanca Motel. The Customs agents followed Worthington when he took off again from Harlingen about 8:30 that night. He landed and refueled at Brownsville, Texas, and then flew back to Harlingen. The aircraft remained on the ground for approximately fifteen minutes, then took off and flew to Mid-Valley Airport, Weslaco, Texas. It remained there for another fifteen minutes before leaving. Due to bad weather conditions, both planes landed at Victoria, Texas, around midnight. The Customs plane taxied in front of appellant's aircraft which had already stopped. One of the agents got out of the Customs plane with a flashlight and his gun in hand. He could see burlap sacks, containing brick-like objects, "piled about" appellant. The agent testified that, in light of his experience, the sacks appeared to contain marijuana. He then told appellant to raise his hands and remain seated in his aircraft. The other Customs agent searched appellant for weapons. Appellant was advised of his *Miranda* rights at this time. He and his aircraft were flown to Corpus Christi and placed in the custody of a DEA agent.

Appellant's chief contention is that his warrantless arrest was illegal due to an absence of probable cause, and thus any evidence derived from the arrest and the ensuing search should have been suppressed as seized in violation of his Fourth Amendment rights. He places the time of arrest at the moment the Customs plane was taxied in front of appellant's aircraft and Customs Agent Williams disembarked with a flashlight and a gun. The district court found that the government had sufficient probable cause to arrest based on the informer's tip, corroborated by the agents' observations and appellant's erratic behavior. The court concluded in the alternative that even if the facts then known were insufficient to provide probable cause for

arrest, sufficient facts were present to justify brief detention of appellant for investigation. Cf. *Terry v. Ohio*, 1968, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889, 903–05. Appellant's contention regarding the time of his arrest was specifically rejected by the district court, which fixed the time of arrest as after the brief detention and the sighting of the burlap sacks in plain view: "The obvious presence of the marijuana in the plane conferred then on them sufficient probable cause for arrest." The court elaborated: "At some point after Williams had gotten out of the plane, he told Worthington to put up his hands, that he was under arrest. The Court is satisfied this took place after Williams saw the sacks in the plane."

■ Time of arrest is a question of fact which depends upon an evaluation of the testimony of those who were present at the time. *Rios v. United States*, 1960, 364 U.S. 253, 262, 80 S.Ct. 1431, 1436–37, 4 L.Ed.2d 1688, 1694. The conclusion of the district court is supported by the record. We therefore hold that appellant was "seized" in a reasonable manner in light of the surrounding exigent circumstances. *Terry v. Ohio*, supra.

■ The facts in this case, as they were known to the Customs agents at the time, provided ample justification for appellant's stop and subsequent arrest. It is true that an informer's tip is not adequate grounds for an arrest or search absent verified, consistent reliability of the informer, an indication of how the informer came by his information, or details of the alleged criminal activities. *Spinelli v. United States*, 1969, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637, 643–44; *United States v. Freund*, 5 Cir. 1976, 525 F.2d 873, 875–76, cert. denied 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 377; *Bailey v. United States*, 5 Cir. 1967, 386 F.2d 1, 3, cert. denied 1968, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408. However, if independent investigation by government agents yields information consistent with and corroborative of the informer's tip, the warrantless arrest is legal. *Draper v. United States*, 1959, 358 U.S. 307,

79 S.Ct. 329, 3 L.Ed.2d 327; *United States v. Freund, supra*, 525 F.2d at 875–76; *United States v. Anderson*, 5 Cir. 1974, 500 F.2d 1311, 1316; *United States v. Summerville*, 5 Cir. 1973, 477 F.2d 393, 395; *United States v. Squella-Avendano*, 5 Cir. 1971, 447 F.2d 575, 581, cert. denied 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369. Here, one of the government agents had received a tip from an informer. While the tip was lacking in detail, its accuracy and reliability were corroborated by the subsequent surveillance of appellant Worthington's activities.

■ Moreover, we view the rapid airport hopping and the transporting of empty boxes, when added to the tip as grounds for reasonable suspicion by the agent that appellant was involved in criminal activity. See *United States v. Robinson*, 5 Cir. 1976, 535 F.2d 881; *United States v. Maslanka*, 5 Cir. 1974, 501 F.2d 208, cert. denied *sub nom. Knight v. United States*, 1975, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777; *United States v. McCann*, 5 Cir. 1972, 465 F.2d 147, cert. denied *sub nom. Kelly v. United States*, 1973, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154. At a minimum the Customs and DEA agents were justified in stopping appellant to investigate further. "[T]he courts have recognized the right of police officers to stop and detain an individual . . . with less than probable cause." (Citations omitted). *United States v. Robinson, supra*, 5 Cir. 1976, 535 F.2d 881, 883. It is the legitimate function of law enforcement agents to detect and prevent crime. See *United States v. McCann, supra*, 465 F.2d at 157–58. It is their duty to be alert for suspicious activities and to follow up with appropriate investigation within constitutional limits. *United States v. Allen*, 5 Cir. 1973, 472 F.2d 145, 147. The agent's observations must lead him "reasonably to conclude in light of his experience that criminal activity may be afoot. . . ." *Terry v. Ohio*, 1968, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911.

■ There was no legitimate, logical explanation for appellant's behavior. The specific, articulable facts within the agents'

knowledge, from the informer's tip to appellant's erratic flight schedule, together with the rational inferences drawn therefrom were sufficient to create a reasonable suspicion that criminal activity was in progress. See *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906; *United States v. Rias,* 5 Cir. 1975, 524 F.2d 118; *United States v. McCann, supra,* 465 F.2d 147. There was much more here than merely an "inchoate and unparticularized suspicion or 'hunch' . . . ." *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. We therefore find that the investigatory stop at the Victoria, Texas airport was warranted for the purpose of investigation.[3]

As soon as the investigatory stop was made, and the flashlight beam was directed into the plane, the agents had probable cause from visual observation to believe that the plane contained contraband. Gunnysacks containing brick-like objects were revealed. Williams testified that, from his experience he was familiar with such packages, and thus knew they often contained kilo bricks of marijuana. We find no error in the court's finding that it was at this time that he advised appellant of his rights and arrested him. Probable cause is present at the instant the facts and circumstances known to the arresting officer warrant belief by a prudent person that a crime has been or is being committed. *Adams v. Williams,* 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; *Dyke v. Taylor Implement Mfg. Co., Inc.,* 1968, 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538; *Beck v. Ohio,* 1964, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142; *Draper v. United States,* 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; *Brinegar v. United States,* 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; *Williams v. United States,* 5 Cir. 1968, 404 F.2d 493. Moreover, the exigent circumstances necessary to justify a warrantless arrest were present here, in view of the "mobility of the [vehicle], the possibility of flight, and subsequent destruction of evidence . . . ." *United States v. Troise,* 5 Cir. 1973, 483 F.2d 615, 617, cert. denied 414 U.S. 1066, 94 S.Ct. 574, 38 L.Ed.2d 471. *See Carroll v. United States,* 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; *United States v. Church,* 9 Cir. 1973, 490 F.2d 353, 355, cert. denied 1974, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760.

Observation of the burlap sacks containing brick-shaped objects in plain view justified the arrest and subsequent search. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." (Citations omitted). *Harris v. United States,* 1968, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069.[4] Discovery of such evidence was not the result of a search. *Marshall v. United States,* 5 Cir. 1970, 422 F.2d 185, 188-89. The stop and search were legitimately conducted and accordingly we reject appellant's claim that the search was tainted by an illegal arrest.

---

3. We agree with the trial court and reject appellant's contention that a full-blown arrest occurred at the precise moment that the Customs plane was positioned in front of appellant's plane, and Customs agent Williams emerged with gun and flashlight in hand. We hold that the stop was made in an acceptable manner under the circumstances present. Blocking the plane was a reasonable manner in which to effect the stop and maintain the *status quo.* An investigatory stop is not automatically an arrest simply because an officer draws his gun. *See United States v. Maslanka, supra,* 501 F.2d at 213, n. 10. From following appellant during his inexplicable flights, and based upon their experience with drug traffickers, the agents reasonably feared death or serious injury when they stopped and approached appellant's plane on the dark, deserted airstrip. Carrying a drawn gun was reasonable under the circumstances.

4. Under the plain view doctrine the officers must discover the evidence by inadvertence and while they have a legitimate reason for being present. *Coolidge v. New Hampshire,* 1971, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. However, the fact that the agents expected to find marijuana does not destroy the necessary inadvertence. *See United States v. Cushnie,* 5 Cir. 1973, 488 F.2d 81, 82, cert. denied 1974, 419 U.S. 968, 95 S.Ct. 233, 42 L.Ed.2d 184.

■ Appellant also argues that the search is illegal because of the "beeper" placed on his aircraft by a Customs agent. We find this contention to be without merit. Attempted use of the "beeper" is without significance in this case since it malfunctioned shortly after its installation and its use produced no evidence whatsoever. We are not called upon to decide the admissibility of evidence discovered by a "beeper", as in *United States v. Holmes*, 5 Cir. 1975, 521 F.2d 859, aff'd *en banc* 1976, 537 F.2d 227. Since the marijuana was not "come at by [the] exploitation of . . ." the electronic device, we need not be concerned with the legality of the installation of the "beeper". *See Wong Sun v. United States*, 1963, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455.

■ Appellant finally urges that the district court erred when it failed to conduct an *in camera* interview with the informer. We find that no such error was made, under the balancing test established in *Roviaro v. United States*, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. Disclosure of an informer's identity is required only if necessary to a fair determination of an accused's guilt or innocence. "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62, 77 S.Ct. at 628–29, 1 L.Ed.2d at 646. The circumstances in each case are determinative of the proper balance. *Id.* "The inquiry centers on the likelihood that the informant possesses facts which are relevant and helpful to the accused in preparing his defense on the merits." *United States v. Freund, supra,* 525 F.2d 873, 876.

■ The evidence in the present case indicates that the informer played no part in the offense charged, and was not present at the time of arrest.[5] The Customs agents, through their own follow-up investigation and surveillance, came upon the marijuana which was plainly visible in appellant's possession in the aircraft. There is no basis here for even a bare supposition that the informer possessed facts either relevant or helpful to Worthington's defense.

We conclude that the facts found by the district court are amply supported by the evidence, that the legal conclusions drawn therefrom are sound, and that the judgment appealed from should be

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

Where does a *Terry* stop stop and an arrest begin? This case calls for distinguishing between those seizures of the person sufficiently limited in their restriction of personal autonomy to permit the extraordinary measure of departing from the probable cause requirement of the fourth amendment and those seizures that must predicated upon that traditional protective standard. Because I find that the dramatic accosting of appellant on the Victoria runway placed an unequivocal clamp on his liberty of movement from the initial moment of the confrontation, I would hold that obedience to fourth amendment jurisprudence, including the investigative stop doctrine, required antecedent probable cause. The majority has not asserted that probable cause existed prior to the confrontation; I have considered the facts and conclude that it did not. Therefore, I must respectfully dissent.

5. Although we found an *in camera* interview to be appropriate in *United States v. Freund, supra*, the facts in the case at bar differ significantly from those in *Freund*. In that case, appellant Freund claimed that the stop was merely for a routine check and therefore the officer lacked probable cause to believe that his truck contained contraband. Freund relied on the DEA's written case summary, describing the stop as a routine check, to support his theory. Moreover, at the trial, it developed that the informer, who had not supplied any information in the case, was present at the search and arrest. *Id.* at 874–75. Because of these unusual circumstances, an *in camera* hearing was appropriate to determine if disclosure would be necessary to help Freund prepare his defense. *Id.* at 877–78. In the present case, there is no controversy regarding the agents' observations. Nor is it even claimed that the informer took part in the offense or was present at the time of arrest.

Accepting the majority's statement of the facts, I shall only recapitulate the circumstances of Worthington's apprehension that give rise to my disagreement on the law. Those circumstances begin with appellant landing his plane in bad weather at Victoria. The two Customs agents landed their plane seconds thereafter. They taxied to the point on the runway where Worthington had stopped, and they pulled the Customs plane directly in front of appellant's aircraft, cutting off his path of movement. Agent Williams disembarked and immediately trained an automatic rifle on appellant. As he did so, he saw the "brick outlines" in the burlap sacks behind Worthington. Though at the moment he disembarked Williams had intended only to investigate further to see whether an arrest might be in order, upon approaching the aircraft and seeing the "brick outlines" he told Worthington to raise his hands and informed him that he was under arrest. No more than a single minute passed between the moment Williams disembarked and the moment he spoke the formal words of arrest.

As stated, I accept this sequence of events. The majority goes further and accepts the trial court's conclusion that, blockaded plane and pointed gun notwithstanding, the initial moment of confrontation constituted an investigative stop, permissible on reasonable suspicion of criminal activity under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. I concur in the majority's assessment that circumstances prior to the confrontation had created the reasonable suspicion required under the investigative stop cases, and I agree that the "brick outlines" sighted during the confrontation gave rise to probable cause in the total complex of circumstances presented. I cannot, however, accept the characterization of that initial confrontation as an investigative stop. I simply cannot persuade myself that Worthington, completely stymied and faced with the barrel of a rifle held by an agent of the law, was under anything less onerous than an arrest. To put the matter bluntly, Worthington was not stopped, he was not frisked, he was simply arrested, before probable cause existed.

The elasticity of *Terry* is not boundless. The trail marked by *Terry* and its issue may be torturous and serpentine, but my understanding is that along its length and at its present juncture this principle remains vital: when a police-citizen confrontation is accompanied by a greater degree of force and restraint directed toward the citizen than is ordinarily or necessarily associated with a policeman's request to stop and answer some questions, it becomes the type of seizure that must rest on antecedent probable cause, whether or not it is within the traditional definition of arrest. From that perspective, I conclude that the seizure here required the traditional probable cause basis.

## I. SUPREME COURT APPROVAL OF SEIZURES UPON LESS THAN PROBABLE CAUSE: THE FRAMEWORK

In *United States v. Ramos-Zaragosa,* 516 F.2d 141, 144–45 (9th Cir. 1975), the Ninth Circuit addressed the taxing issue this panel now faces:

The line between evidence seized pursuant to an unlawful arrest which must be suppressed * * * and evidence seized on the basis of probable cause which developed concurrently with a reasonably brief investigatory stop * * * is a difficult one to draw and follow.

* * *

We realize this state of affairs is not an entirely happy one for law enforcement officials. It is not surprising that such poorly marked boundaries are sometimes transgressed. Our task, however, is to preserve the markings as best we can. We cannot do this by pretending they do not exist.

Full consideration of this issue requires a brief return to those few Supreme Court decisions that have identified various police-citizen encounters as "seizures" within the fourth amendment yet validated them upon less than probable cause.

Chief among them is *Terry* itself. The state in that case argued that

> in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess.

392 U.S. at 10, 88 S.Ct. at 1874. As the defendant urged, this argument sought a significant departure from traditional fourth amendment analysis, under which all official behavior intrusive or restraining enough to fall within the definitions of searches and seizures had to meet the standard of probable cause, determined, with narrow exceptions, by a neutral magistrate. *See* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 358 (1974).

The Court appropriately recognized that a variety of modes of police-citizen confrontations not within the traditional confines of an arrest involved intrusion and coercion sufficient to require regulation by the fourth amendment. The Court rejected the notion that all those "seizures" would require probable cause, however, and indicated qualified approval of the argument for an "escalatory set of responses" subject to a general reasonableness test:

> In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness.

392 U.S. 17, n. 15, 88 S.Ct. 1878.

Within this general framework, the Court recognized that departures from the probable cause requirement called for extremely careful balancing of the government interests in support of a particular law enforcement measure against the intrusion upon individual privacy and freedom of move-

ment. *Terry* itself presented the Court with a weapons pat-down of a citizen whom a patrolman wished to question on a public street. Without explaining what factors would indicate at the time of an apprehension that it was an arrest, the Court commented that an arrest's inevitable interference with future freedom of movement created a significantly greater restraint than the pat-down in question. The Court concluded that the interest in protecting the policeman from danger justified the carefully circumscribed weapons search.[1]

In short, *Terry* recognized that the extraordinary measure of departing from the probable cause requirement for certain "seizures" of the person short of arrest could be consistent with the fourth amendment. Each particular type of seizure, however, requires under *Terry* a careful weighing of governmental and individual interests. *Terry* neither diluted one whit the probable cause requirement for an arrest nor said that every seizure less oppressive than an arrest is permissible upon less than probable cause. The opinion simply set forth the balancing principle and found that it allowed for the limited, though significant, intrusion of a weapons pat-down in the situation presented.

On only two occasions since *Terry* has the Court found seizures valid on less than probable cause. In each, the Court again carefully focused on the limited nature of the intrusion as against the asserted government interests.

In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court explicitly recognized that a "stop", as well as a "frisk", could fall within *Terry*. Justice Rehnquist depicted the type of confrontation that might be authorized on less than probable cause:

> A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may

---

1. Finding only the pat-down in issue, the majority in *Terry* declined to decide whether an investigative stop for brief questioning could itself be permitted without probable cause.

*See Terry, supra,* 392 U.S. at 19, n.16, 88 S.Ct. 1868. Justice Harlan maintained in concurrence that the majority had implicitly approved such a stop. *See id.* at 32–33, 88 S.Ct. 1868.

be most reasonable in light of the facts known to the officer at the time.

407 U.S. at 146, 92 S.Ct. at 1923. *Adams* specifically approved only a patrolman's actions in walking toward a parked car and, after the suspect had rolled down the window as a response to the officer's request to get out of the car, reaching inside to check his waistband for a gun.

In *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court for the first time voiced approval of the stopping of a moving vehicle upon less than probable cause.[2] Faced with the strong government interest in control of illegal aliens, the Court recognized that a Border Patrol officer with a reasonable suspicion that a particular vehicle contains illegal aliens may stop the car briefly to question the occupants. The Court again focused on the limited nature of the intrusion—a detention normally lasting less than a minute, visual inspection no greater than that available to anyone standing alongside a car, and questioning restricted to citizenship, immigration status, and particular suspicious circumstances.[3]

*Brignoni-Ponce* represents the extreme, in terms of interference with privacy and freedom of movement, to which the Court

has taken the concept of nonarrest seizures that do not require probable cause. Arguably any seizure more intrusive or restraining must be predicated upon that traditional showing. At the least, any such seizure requires a return to the constitutional scales to determine what specificity of information the officer must possess before acting—probable cause, reasonable suspicion, or perhaps a category in between. *See Note, Nonarrest Automobile Stops: Unconstitutional Seizures of the Person*, 25 Stan. L.Rev. 865, 879 (1973). With this framework in mind, I now turn to cases confronting more directly the problem of characterizing seizures similar to the apprehension of Worthington.

## II. SEPARATING "PROBABLE CAUSE" AND "REASONABLE SUSPICION" SEIZURES

### A. *The Battleground of Decisions*

Determining what police actions turn a particular encounter with a citizen into an arrest, *i. e.*, a seizure requiring probable cause,[4] has been a task undertaken only by the court of appeals. Several decisions at this level stand consistent with the proposition that police-citizen confrontations evidencing significantly greater force or restraint than the stops in *Terry, Adams,* and *Brignoni-Ponce* require probable cause.[5]

---

**2.** Prior to .this decision, a strong argument could be made that stopping a motorist involved sufficiently greater restraint than the measures approved in *Terry* and *Adams* to require probable cause. *See* Note, Nonarrest Automobile Stops: Unconstitutional Seizures of the Person, 25 Stan.L.Rev. 865 (1973).

**3.** The Court did not discuss the manner of effecting a stop.

**4.** I shall for convenience label such a seizure as an arrest without suggesting that traditional definitions of that term determine the applicability of the probable cause standard.

**5.** In the cases discussed in Part I, *supra,* the Supreme Court did not have occasion to address the factors that would distinguish stops from arrests. Elsewhere the Court has offered only hints toward the resolution of various aspects of that inquiry.

In *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), a pre-*Terry* opinion, the Court approved the government's concession that waving the defendant's car to a stop so restricted his liberty of movement that

it completed an arrest. Because probable cause was lacking at that moment, subsequently discovered "fruits" had to be suppressed. If the general law enforcement interests recognized in *Terry* and *Adams* carry the same weight as the border control interests supporting the auto stop in *Brignoni-Ponce*, the holding in *Henry* has been significantly cut back. One commentator has suggested, however, that in any case the *Henry* analysis retains validity where the accosting is effected by "an unequivocal show of force." Cook, *Varieties of Detention and the Fourth Amendment,* 23 Ala.L.Rev. 287, 290 (1973).

The decision in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), also eliminates one aspect of our line drawing task. There the Court held that briefly taking a suspect to the police station for the sole purpose of fingerprinting required probable cause. The position implies that intent to charge or prosecute is not an essential element of the category of seizures requiring probable cause. *See* Amsterdam, *supra,* at 453, n. 217.

One preliminary observation, to which I do not understand the majority to object, must be made. The determination whether an arrest has occurred must rest on the objective facts of the particular incident. The subjective intent of the officer is in no way controlling; certain facts may give rise to an arrest despite an officer's lack of intent to arrest or his subsequent disclaimer. *See Taylor v. Arizona*, 471 F.2d 848 (9th Cir. 1972); *Cf. United States v. Tharpe*, 536 F.2d 1098 (5th Cir. 1976) (en banc).[6]

Consistent with that objective focus, *United States v. Strickler*, 490 F.2d 378 (9th Cir. 1974), should in my opinion be dispositive of this appeal. There a patrolman had received radio directions to "approach" a Cadillac. This coordinated response ensued: two squad cars pulled directly in front of and behind the Cadillac; a third drew alongside it, and the patrolman in the passenger seat pointed a gun at the suspects, ordering them to raise their hands.

Judge Hufstedler, writing for the court, emphatically rejected the suggestion that this encounter could be deemed an investigatory stop:

> we simply cannot equate an armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands with the "brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information" which was authorized in *Williams.*

490 F.2d at 380. Rather, the court concluded that this action completely restricted defendants' movements and constituted an arrest.

The only factual distinction between *Strickler* and the instant case lies in the finding that when Agent Williams pointed the rifle at appellant he had not yet ordered him to raise his hands.[7] Can it be seriously suggested that one staring at the wrong end of an automatic rifle needs words of encouragement to realize the time has come to remain in place and strain his arms heavenward? I would not place controlling significance in the omission of so superfluous a command.[8]

A problem analogous to that before us arises when officers, with probable cause to arrest, engage in a search of a suspect. Courts have found it necessary to set the time of arrest in this context to determine if the search was "incident" to it. *But see Sibron v. New York*, 392 U.S. 40, 70, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring). Decisions in this context support the conclusion that apprehensions of the type presented in the instant case are arrests.

This court made such a decision in *United States v. Birdsong*, 446 F.2d 325 (5th Cir. 1971). We determined that the appellant's arrest had become complete when officers ordered him out of his parked car, surrounded him, and removed the keys from his car's ignition. The absence of formal words of arrest was not determinative.

Similarly, in *United States v. Lampkin*, 464 F.2d 1093 (3d Cir. 1972), the court found an arrest completed at the instant agents approached defendant on foot with guns drawn, halted him, and identified them-

---

**6.** Note the argument that in situations where an officer's objective assessment of circumstances would not justify his conduct under fourth amendment standards, then and only then should that subjective assessment control. *See United States v. Tharpe*, 536 F.2d 1098, 1102 (5th Cir. 1976) (Gee, J., dissenting); *id.* at 1103 (Goldberg, J., dissenting).

**7.** By the time appellant was ordered to raise his hands, Agent Williams had seen the "brick outlines" that would have provided probable cause for an arrest. Characterization of the initial confrontation, however, must focus only on the moment when Williams, having blocked appellant's path of departure, trained his rifle on a man he concededly had no probable cause to arrest.

**8.** The Tenth Circuit has taken a similarly cautious view of the degree of seizures permissible on less than probable cause. In *United States v. McDevitt*, 508 F.2d 8 (10th Cir. 1974), the court observed that the stopping of a truck followed by a period of 15–20 minutes during which there was no evidence the defendant was free to leave constituted an arrest.

selves. The circumstances showed an absolute restraint of the defendant that was abundantly clear to him.[9] *See also United States v. See*, 505 F.2d 845 (9th Cir. 1974) (arrest of defendants at service station complete when patrolman instructed them they were not "free to leave" and that they were to surrender their handguns).

Even courts that have found that particular encounters amounted to investigative stops rather than arrests have adhered to the principle that confrontations involving significantly greater restraint than those specifically approved by the Supreme Court require antecedent probable cause. Most significant in this regard is *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1975), which offers a salutary delineation of one feature attending those seizures that have been upheld upon less than probable cause. The court denominated the confrontation before it a "stop" because it

> was accompanied by no greater use of force than is involved in any request by a peace officer to stop and answer some questions.

500 F.2d at 1028.

The encounter in *Richards* began with one agent walking, gun holstered, to a suspect's plane preparing for takeoff. He requested the pilot to disembark and answer a few questions. Upon the pilot's refusal, another agent stepped in front of the plane and pointed a pistol at the pilot.

The court's application of the standard quoted to the facts before it raises serious questions from my perspective.[10] Even accepting the *Richards* conclusion for purposes of argument, however, one significant feature distinguishes the situation there from that before this panel today. In *Richards* the initial confrontation was as noncoercive as possible. Only upon defendant's refusal to disembark did the second agent step in front of the plane with weapon drawn. That particular sequence assumes importance when considered against the evolution and nature of the investigative stop concept.[11]

*Terry* itself was a response to a plea for at least one additional tier of permissible police responses to developing situations in the streets. Law enforcement officials had claimed the necessity of *some* on-street investigative detention power that did not require probable cause. When a seizure is effected by more than the force that accompanies any request to stop and answer questions, especially if identical to the degree of force that would be used in effecting an arrest, the law enforcement aid *Terry* offered is perverted, and severe problems arise for judicial review. As stated above, subjective intent to take a person into custody does not control that review; neither do formal words of arrest. The plain view doctrine will eliminate the possibility of considering the length of detention where, as here, the officer effecting the purported "stop" instantaneously sees evidence creating probable cause and instantaneously proceeds formally to arrest the suspect. In such circumstances, one can judge the nature of the confrontation only by its initial coerciveness.

---

**9.** The court commented that the restraint evidenced an intent to arrest. I have stated above my understanding that subjective intent to arrest is not determinative.

**10.** Judge Hufstedler, who wrote *Strickler, supra*, dissented in *Richards*, maintaining that the apprehension of the pilot was an arrest. The particular nature of the facts in *Richards*, as will be developed in the text *infra*, makes any choice between *Strickler* and *Richards* unnecessary for purposes of this opinion.

**11.** There can be no suggestion that the relatively noncoercive approach to the plane found crucial to the finding of a mere "stop" in *Richards* is irrelevant to the present appeal because the agents here faced more dangerous circumstances. The indices of danger were at least as great in *Richards*. While the confrontation there did take place in the daylight, the agents had seen the suspect load a rifle scabbard onto the plane. No such concrete evidence of danger was in the hands of the officers here.

This observation is not meant to contradict the majority's observation that the agents reasonably concluded the circumstances were dangerous. Rather, it is to point out that those circumstances alone do not justify a finding that a confrontation involving this degree of coercion from the outset was an investigative stop.

These observations militate for adoption of a test along the line suggested in *Richards.* Probable cause is required to support seizures effected by force greater than that inherent in any request to stop for questioning.

This analysis could help explain decisions such as *Dell v. Louisiana,* 468 F.2d 324 (5th Cir. 1972). There an officer summoned a moving vehicle to the curb. When the defendant did not respond, the officer lifted his shotgun into the motorist's view, and the car pulled out. Without any discussion of the manner of effecting this seizure, we treated it as a stop permissible on "somewhat less" than probable cause.

That summary conclusion is not controlling here. In the first place, *Dell* involved solely the display of a gun, not a coordinated action designed to cut off all escape and confront the suspect with the threat of deadly force. In any case, the display of the gun in *Dell* did occur only after the suspect refused to follow the signal to pull to the curb. Therefore the initial moment of confrontation evidenced no greater coercion than that comprehended by any request to stop for questioning.

Finally, *United States v. Maslanka,* 501 F.2d 208 (5th Cir. 1974), relied on by the majority, is consistent with both the approach outlined above and a conclusion that the confrontation in the case before us went beyond a mere investigative stop. In *Maslanka* an officer chased a car whose occupants were suspected of involvement in drug transactions at speeds over 100 miles per hour for several miles. When the car pulled over, the officer approached from behind with pistol drawn.

This court's treatment of that set of circumstances at most stands for the proposition, noted by the majority, that an armed approach to a stopped car is not by reason of the weapon alone an arrest. The unequivocal blockading of Worthington's path of movement, however, adds a significant dimension not raised by the simple presence of a gun. As was the case in *Strickler,* where Judge Hufstedler found the armed approach to a surrounded car to be an arrest, the degree of coercion here far exceeded that normally attendant, even in dangerous circumstances, upon a simple request to answer questions. The *Maslanka* panel recognized the distinction between the facts before it and those in *Strickler* and cited the latter with seeming approval.

Moreover, the panel explicitly offered its characterization of the confrontation as a stop as an alternative holding. The officer in *Maslanka* had probable cause to arrest for the high speed chase itself. The runway search before us lacks the alternative basis found to support the runaway search in *Maslanka.* To the extent any comments in that case, and I can find none, suggest any broad extension of the *Terry* rationale to coercive confrontations such as *Strickler,* I would decline to follow them.

### B. *Synthesis*

The following analysis emerges from the Supreme Court discussion of police-citizen confrontations that justify departure from the probable cause requirement and court of appeals decisions considering the point at which a confrontation so restrains personal liberty that it must rest on that traditional showing. The Supreme Court's careful weighing of the degree of intrusiveness occasioned by the nature of specific encounters, particularly in *Terry* and in *Brignoni-Ponce,* suggests that the degree of restraint and intrusion inherent in those "stops" may be the limit permissible upon less than probable cause. At a minimum the approach indicates that a seizure involving any greater coercion or intrusion requires a new assessment of the balance between individual liberty and governmental needs.[12]

12. I would have the gravest doubts about any attempt to draw from the reasonableness balance additional categories of information requirements between probable cause and reasonable suspicion. Subsequent development of the "reasonable suspicion" standard has strongly vindicated Justice Douglas's dissenting warning of the departure from probable cause in *Terry;*

> Only that line draws a meaningful distinction between an officer's mere inkling and the presence of facts within the officer's personal knowledge which would convince a reasonable man that the person seized has commit-

Characterizing the intrusiveness of a confrontation must proceed from its objective circumstances. Neither intent to charge with a crime nor formal words of arrest are prerequisites of a seizure that must be based on probable cause. On occasions when the immediate discovery of evidence at the confrontation directly brings about formal arrest, neither the duration of the alleged "investigative stop" [13] nor the act of taking into custody is available to aid in assessing the initial encounter. Analysis must therefore proceed from the degree of coerciveness demonstrated in that initial "seizure". At least where that initial confrontation is accompanied by a degree of coercion and restraint—as may be manifested by a threat of deadly force or the actual obstruction of avenues of escape—greater than that ordinarily or necessarily associated with a policeman's request to stop and answer questions, I would hold that the probable cause requirement must be satisfied.

## III. APPLICATION

It remains but to apply this analysis to the facts at hand. How the agents could have made a more unequivocal demonstration of restraint in the few seconds that preceded the sighting of the "brick outlines" is difficult to imagine. The agents used their plane to block appellant's aircraft, cutting off his only path of move-

ment. Agent Williams jumped out and immediately trained his Carbine on Worthington. The only further step he could have taken, a step he did take seconds later when the sighting of the "brick outline" had intervened, was explicitly to order Worthington to raise his hands. As stated above, I cannot regard that omission as determinative.

The concatenation of two dramatic acts—the blockading of the plane and the leveling of the rifle—takes this case far beyond an ordinary request to stop and answer questions, even a request directed to a moving vehicle. The sight of flashing red lights in the rear view mirror may be unwelcome and may bring on sinking sensations in the pit of the motorist's stomach. I cannot conceive that the intrusion compares to that which besets the individual target of the type of accosting involved here. I would consequently deem the seizure of Worthington an arrest. To do otherwise places a judicial imprimatur on ever increasing intrusions into individual privacy, in ever increasing derogation of the fourth amendment's protective promise to the citizens of our land.

The majority does not state that the agents had probable cause to arrest prior to the confrontation. I cannot conclude that the standard was met. Therefore I would reverse and require suppression of the marijuana discovered on the plane.[14]

---

ted, is committing, or is about to commit a particular crime.

*Terry, supra,* 392 U.S. at 38, 88 S.Ct. at 1888. Any taxonomical amendments could only add to the confusion resulting from what is already a nigh unreal and unmanageable trinity of categories—probable cause, reasonable suspicion, and no cause. One commentator has offered cogent forewarning of the effect of proliferating categories into a general sliding scale to assess the reasonableness of various confrontation:

What it means in practice is that appellate courts defer to trial courts and trial courts defer to the police. What other results should we expect? If there are no fairly clear rules telling the policeman what he may and may not do, courts are seldom going to say that what he did was unreasonable.

. . . In the real world of the streets and the trial courts, multiplication of grada-

tions means the disappearance of the distinctions that are supposed to separate them. Amsterdam, *supra,* at 394.

A reading of search and seizure cases is already a voyage into a storm of semantics. Further abdication to the semanticists would mean less protection of the individual, not more refined safeguards.

**13.** Where the index of duration is available, it has been suggested that, regardless of other circumstances, any detention that is more than "brief" must rest on probable cause. *See* Amsterdam, *supra,* at 453, n. 217; *cf. United States v. McDevitt,* 508 F.2d 8 (10th Cir. 1974).

**14.** This result would visit no great burden on law enforcement officers attempting to deal with drug traffic. After *Terry,* many authorities suggested limiting the doctrine of investigative stops to crimes involving danger to persons or property. *See, e. g.,* American Law

Dissenting in *Terry,* Mr. Justice Douglas adverted to the

> powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees and give the police the upper hand.

*Terry, supra,* 392 U.S. at 39, 88 S.Ct. at 1889. Time has borne out his warning of the frailty of the protection offered against arbitrary police action by the "reasonable suspicion" test. Mr. Justice Marshall recanted his concurrence in *Terry* and wrote in dissent in *Adams:*

> It seems that the delicate balance that *Terry* struck was simply too delicate, too susceptible to the "hydraulic pressures" of the day. As a result of today's decision, the balance struck in *Terry* is now heavily weighted in favor of the government. And the Fourth Amendment, which was included in the Bill of Rights to prevent the kind of arbitrary and oppressive police action involved herein, is dealt a serious blow.

*Adams, supra,* 407 U.S. at 162, 92 S.Ct. at 1931.

I believe we face those same hydraulic forces again today. That the flood we must deal with may seem small attests only to the dimensions of past deluges; it does not justify acquiescence in another. I must respectfully dissent.

---

Institute, A Model Code of Pre-arraignment Procedure § 110.2 (1975). The ALI proposal was based on the observation of specialized narcotics agents that the investigative stop was not a particularly useful or common technique for dealing with drug offenses. The Supreme Court, however, appeared to decline the invitation to adopt this limitation in *Adams, supra. See* Note, The Supreme Court 1971 Term, 86 Harv.L.Rev. 1, 180 (1972).