UNITED STATES of America

v.

Jeffrey Todd MARSHALL and Louis James Sterrenberg.

No. 77–533–Cr–JLK.

United States District Court, S. D. Florida.

June 14, 1978.

---

1284

Kevin M. Moore, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Joseph Mincberg, Miami, Fla., for Sterrenberg.

Peter Baraban, Miami, Fla., for Marshall.

## MOTION TO SUPPRESS

JAMES LAWRENCE KING, District Judge.

This cause came on for consideration upon the motion of the defendant, LOUIS JAMES STERRENBERG, to suppress the evidence obtained by the Government as a result of a warrantless search and seizure conducted on the vessel "Yella Bird" by agents of the United States Customs Service. This motion was adopted by Defendant JEFFREY TODD MARSHALL. The Defendants are charged with possession with intent to distribute marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. Section 841(a)(1).

After a hearing on this matter, the Magistrate recommended that the defendant's motion be granted, predicating this result on the agents' failure to meet the constitutional standard applicable in customs searches.[1] In addition, the Magistrate found that the seizure could not be justified under the plain view exception to the warrant requirements of the Fourth Amendment.

Because this court finds that the seizure herein falls within the plain view doctrine, we need not reach the issue of whether the Magistrate correctly applied the reasonable suspicion standard—the standard appropriate to customs searches—to the facts in the present case.

## I. THE FACTUAL BACKGROUND:

On December 4, 1977, at 6:45 a. m., a forty-one foot Hatteras pleasure craft, subsequently identified as the "Yella Bird", was observed by a United States Customs patrol boat about three miles east of Haulover Cut, Miami, Florida. On board the customs boat were three officers, two of whom were in uniform. All were armed.

The "Yella Bird" appeared to be riding low in the water in a rolling or pitching sea and she was not making headway. However, her engines appeared to be running. As the customs agents approached, they observed some scratches and scrapings on the boat's starboard side and noted the presence of two males on board. They further observed four fishing poles, none of which were in use.[2]

As the customs boat closed to within twenty feet of the "Yella Bird", one of the boat's occupants asked if the agents would like to come aboard and he offered to throw

1. Customs searches are conducted pursuant to the provisions of 19 U.S.C. Section 1581 as follows:

"Boarding vessels
(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof . . . and to this end may hail and stop such a

vessel or vehicle, and use all necessary force to compel compliance."
However, case law has interpreted this section to require that officers meet a probable cause threshold when they purport to act under its authority. *United States v. Williams*, 544 F.2d 807 (5th Cir. 1977); *United States v. Afandor*, 567 F.2d 1325 (5th Cir. 1978).

2. The customs officers acted without prior knowledge of the "Yella Bird's" activities or the route which it had traveled.

them a line.[3] The "Yella Bird" made no attempt to flee.

Customs Agent Wayne, and then Agent Weber, boarded the "Yella Bird."[4] Agent Wayne, on the rear portion of the boat, examined its registration papers and ascertained that it was not registered in the names of either person on board.

The agents then noticed that the two sliding doors to the salon were locked and that the curtains behind the glass panels were drawn. Further, they observed that as the boat pitched, the curtains would separate.

Agent Weber wiped the moisture from one of the windows. As the waves rolled the ship, the curtains parted, allowing Weber to see bales of a yellowish color stacked inside.

The occupants of the "Yella Bird" were instructed to bring the vessel into dock. Upon arrival, the salon doors were pried open with a screw driver and the bales examined. A field test was performed which indicated the presence of marijuana. Eighty-four bales (totalling 3703 pounds) of the substance were on board.

3. Agent Wayne testified that had he been in command, he either would have boarded or ordered the boat to proceed to port. Agent Collins, the officer in charge, stated that it was his intention to board regardless of the will of the occupants.

4. Two other factors which came to light on boarding and which were considered significant by the Magistrate in applying the reasonable suspicion standard were: (1) the presence of bait on the deck, and (2) the failure of the agents to detect any odor of marijuana. The Magistrate felt these facts tended to support a legitimate alternative explanation of the "Yella Bird's" activities—namely, that the boat was involved in fishing. Because the agents boarded through the consent of defendants this court does not address this finding.

5. The essence of the plain view doctrine may be understood best by considering the manner in which it allays the concerns underlying the Fourth Amendment. In supplying a rationale for the plain view doctrine, Coolidge sets forth "the two distinct constitutional protections served by the warrant requirement," and demonstrates that neither is offended by a plain view seizure.

## II. THE PLAIN VIEW DOCTRINE

The manner in which the evidence came to light falls within the plain view doctrine. See, United States v. Arredondo-Hernandez, 574 F.2d 1312 (5th Cir. 1978).

As a fundamental rule, searches conducted without the prior approval of a judge or magistrate are unreasonable per se under the Fourth Amendment, subject only to a few well delineated exceptions. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One of the more recently recognized exceptions is the plain view doctrine. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The doctrine centers on the observation of evidence by an officer standing in a place where he is legally entitled to be. United States v. Woods, 560 F.2d 660 (5th Cir. 1977).[5] More specifically, the plain view doctrine may be invoked to support a subsequent search and seizure where (1) the initial intrusion which afforded the view was lawful, (2) the discovery of evidence was inadvertent, and (3) the incriminating nature of the evidence was immediately apparent. Coolidge, supra, 403

The first protection centers on the sanctity of one's domain.

First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. 403 U.S. at 467, 91 S.Ct. at 2038. Coolidge then points out that the plain view doctrine does not pose a threat to one's domain because it comes into play only after the domain has been entered validly for some other purpose.

The second constitutional protection set forth in Coolidge is "served by the warrant requirement"—avoidance of "general, exploratory rummaging in a person's belongings," even after a prior valid intrusion. Coolidge points out that the plain view doctrine does not offend this protection either because

[g]iven the initial intrusion, the seizure of an object in plain view is consistent with the second objective, since it does not convert the search into a general or exploratory one. As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. 403 U.S. at 467, 91 S.Ct. at 2039.

U.S. at 464–474, 91 S.Ct. 2022; *United States v. Berenguer*, 562 F.2d 206, 210 (2nd Cir. 1977).

## A. REQUIREMENT ONE: THE INTRUSION MUST BE LAWFUL

■ The intrusion into the constitutionally protected area must be lawful. *Coolidge* defines four types of intrusion which could meet this requirement. The types of intrusion to which the plain view doctrine applies are those where the police discover evidence: (a) while executing a warrant to search a given area for specified objects and in the course of the search come across some other article of incriminating character; or (b) inadvertently, while in "hot pursuit" of a fleeing suspect; or (c) during a search incident to arrest that is appropriately limited in scope; or (d) while not searching for evidence against the accused, but nonetheless inadvertently come across an incriminating object. *Coolidge, supra*, 403 U.S. at 465–466, 91 S.Ct. 2022. The intrusion which occurred in the present case falls within the confines of type (d) above.

Consent is an acceptable justification for an intrusion into a constitutionally protected area. *Nordskog v. Wainwright*, 546 F.2d 69 (5th Cir. 1977). However, consent to search must be freely and voluntarily given. *United States v. Ellis*, 547 F.2d 863 (5th Cir. 1977). In essence, consent is assent without coercion. But, one need not desire affirmatively that a search be conducted in order for consent to be voluntary. In determining whether consent is free, the totality of the circumstances surrounding the consent must be examined. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Hall*, 565 F.2d 917 (5th Cir. 1978).

■ The record indicates that when the customs agents approached the "Yella Bird", the defendants asked if they would like to come aboard and then offered to throw them a line. The Magistrate expressed the view that the voluntariness of

the consent inherent in this invitation was vitiated because of the close approach of the customs boat with the uniformed and armed officers on its deck.[6] This court cannot agree.

■ The presence of uniformed and armed officers does not vitiate consent. Presence alone, absent any indication of coercive words or acts, is insufficient to raise an inference of submission to police authority. *United States v. Griffin*, 530 F.2d 739 (7th Cir. 1976); *United States v. Peterson*, 524 F.2d 167 (4th Cir. 1975). As was stated in *United States v. Thompson*, 356 F.2d 216, 220 (2nd Cir. 1965):

> To sustain such a claim of coercion, absent any coercive words or acts by the police, would preclude a voluntary consent to search whenever more than one armed police officer confronts a suspect; it is only their number, their equipment and the fact that they were police that appellant claims adds up to coercion. *We refuse to so hold.* (Emphasis added).

The *subjective* intent of the officers in boarding and searching does not detract from the validity of the voluntary consent. The intent or knowledge of the officer is irrelevant as long as it is unvoiced—that is, not stated to the subject of the search. *United States v. Charpentier*, 438 F.2d 721 (10th Cir. 1971).

A consent issue analogous to the one posed by the instant case appeared in *Nordskog v. Wainwright, supra*. In *Nordskog*, uniformed police officers appeared at the defendant's door ostensibly to ask some questions about a neighborhood incident. Defendant invited the officers into his home where they found evidence in plain view. A motion to suppress alleging an illegal search and seizure was denied. The court held that the entry onto the property and the subsequent discovery of evidence constituted legitimate police activity within the purview of the plain view doctrine.

■ True, a person may limit the scope of the consent which he gives. *United States v. Griffin*, 530 F.2d 739 (7th Cir.

---

6. Opinion of Magistrate Shapiro at 4–5 (February 24, 1978).

1976). In the present case the defendants consented to the boarding of the "Yella Bird" by the customs agents. This court does not hold that, in permitting the boarding, the defendants were consenting to a full-scale search. Rather, the court finds that at the very least, the defendants consented to the physical presence of the officers on the rear portion of the boat from which the evidence could be observed in plain view.

In sum, the consent of the defendants provided the means by which the intrusion was accomplished. This consent was of the type contemplated by *Nordskog* and *Walker, supra.* Further, its scope extended to the place on which the agent stood when he made the crucial observation. Applying the "totality of circumstances" test mandated by *Schneckloth, supra,* to the record in the case *sub judice,* it must be concluded that the consent was voluntary and the boarding lawful and proper. Therefore, the first requirement for invoking the plain view doctrine was satisfied.

**B. REQUIREMENT TWO: DISCOVERY MUST BE INADVERTENT**

The second requirement is that the discovery of the evidence must be inadvertent. *Coolidge* proscribes an anticipated discovery—that is, a "discovery" where an officer knows the location of the evidence in advance of the search. *Coolidge, supra,* 403 U.S. at 470, 91 S.Ct. 2022; *United States v. Bolts,* 558 F.2d 316, 320 (5th Cir. 1977).

The inadvertence which must attend the discovery in order to satisfy this second requirement will not be found to exist where the police have probable cause to believe that evidence will be found. *United States v. Worthington,* 544 F.2d 1275 (5th Cir. 1977). The purpose of this requirement is to prevent the police from using their entry into the protected area as a mere subterfuge for plain view reconnoitering.

Although there were a number of things about the "Yella Bird" which might have aroused curiosity (i. e. the boat was stationary with engines running, seemed low in the water, had scrape marks on one side, etc.) the totality of the circumstances known to the agents as they first approached the boat did not equate with probable cause. The "Yella Bird" might have been involved in a number of perfectly legitimate activities. The agents could not have anticipated the discovery within the meaning of *Coolidge.*

However, the issue of inadvertence is made more difficult in light of the agent's decision to wipe the moisture from the window. It is uncontested that Agent Weber wiped the moisture from one of the windows to enable him to see the marijuana stacked inside as the ship rolled and pitched causing the curtains to part.

This court believes that this did not undercut the impact of the plain view doctrine. Plain view applies to articles which can be seen through a window. *United States v. McDaniel,* 550 F.2d 214, 218 (5th Cir. 1977). The presence of a shade or cover on the window will not prevent the operation of the doctrine. *United States v. Anderson,* 552 F.2d 1296, 1298 (8th Cir. 1977). The marijuana in the salon was guarded from the view of the officers only by a light mist on the window placed there by nature's own hand. Had the officers boarded two hours later the morning sun would have dissipated the mist making the evidence clearly visible.

Wiping away a light mist is analogous to the use of a flashlight to pierce the darkness. Numerous cases have permitted the use of flashlights to bring objects into view. *United States v. Pugh,* 566 F.2d 626 (8th Cir. 1977); *United States v. Worthington, supra.* If it is permissible for an officer to use a flashlight to penetrate a natural darkness, it is only logical to permit an officer to remove a mist of equally natural origin.

**C. REQUIREMENT THREE: INCRIMINATING NATURE IMMEDIATELY APPARENT**

The third requirement is that the incriminating nature of the evidence must be immediately apparent. Probable cause

is the standard of certainty which must accompany this recognition. *United States v. Worthington, supra.* That is, once the officer has observed the evidence, he cannot seize it unless he has probable cause to believe it is incriminating.

In the present case, there were facts sufficient to support such a finding. In this regard, after the agents boarded the "Yella Bird" it was determined that the "Yella Bird" was not registered in the name of either of the occupants. Second, Agent Wayne saw the baled material in the salon. Third, the "Yella Bird" was riding low in the water, suggesting that it carried a substantial cargo, and there were scrapes on the boat's side, suggesting a transfer of cargo. Finally, the experienced agents knew Miami to be a large drug importation and distribution center. Customs officers are permitted to draw reasonable inferences from the facts in light of their knowledge and experience. *United States v. Reyna,* 546 F.2d 103 (5th Cir. 1977); *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

█ In sum, the totality of these circumstances supports a finding that there was probable cause to believe that the evidence observed was incriminating in nature.

Thus, it must be concluded that the evidence came to light in an appropriate manner.

It is therefore,

ORDERED and ADJUDGED that the Defendant's Motion to Suppress be and the same is hereby denied.